**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL MCKENZIE, individually and doing business as AMERICAN IMAGE ART, an unincorporated dba,<br><br>    Plaintiff,<br><br>    v.<br><br>ARTISTS RIGHTS SOCIETY, INC., and JANET HICKS,<br><br>    Defendants. | CIVIL NO. 22-cv-1619<br><br>**VERIFIED COMPLAINT AGAINST DEFENDANTS FOR DAMAGES FOR THEIR VIOLATIONS OF THE LANHAM ACT AND FOR RICO VIOLATIONS, BOTH PREDICATED UPON DEFENDANTS' FRAUDULENT REPRESENTATION OF OWNERSHIP OF A COPYRIGHT TO THE LOVE IMAGE CREATED BY ROBERT INDIANA, THROUGH REPEATED ACTS OF WIRE FRAUD, MAIL FRAUD AND MONEY LAUNDERING**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Michael McKenzie, individually and doing business as American Image Art (hereinafter sometimes collectively referred to as "American Image"), alleges as follows for his Verified Complaint against Defendants.

### The Nature of this Action

1.    American Image is a prolific art publisher which for many years worked with artist Robert Indiana in ways that were beneficial to the business and property of American Image and Robert Indiana.

2.    American Image created and with Indiana thereafter produced and marketed for many years an Image called HOPE. It was in competition with another Indiana image called LOVE which was marketed by another purported art producer, Morgan Art Foundation Limited, with the assistance of Defendants herein, Artist Rights Society, Inc. ("ARS") and Janet Hicks, ARS's senior vice president in charge of licensing and marketing.

1

3.      Defendants have for years marketed LOVE, which they licensed for use by hundreds of manufactures, vendors and retailers who have used the LOVE image on products they produced and sold such as paintings, sculptures, prints, t-shirts, pencil sharpeners, glassware, and other goods. These products, with the LOVE image on them to enhance their marketability, can be found offered for sale from novelty and antique stores selling older collectibles to Amazon and eBay.

4.      Neither American Image's HOPE image, nor the LOVE image, have ever been copyrighted. Yet, the Defendants have combined together and with the other Participants named herein for at least two decades to fraudulently represent that they, and others acting in concert with them, had and still have a copyright on the LOVE image; and they have been fraudulently licensing their falsely-claimed copyright to the LOVE image, charging many hundreds of licensees many hundreds of thousands of dollars for use of their falsely claimed copyright and collecting millions of dollars paid by the licensees to use the supposed LOVE copyright.

5.      This repeated false marketing has injured and continues to injure American Image in its marketing of the HOPE image because, by falsely claiming that the LOVE image was copyrighted, Defendants and other Participants named herein gave the LOVE image what was perceived to be an added value over the HOPE image.  Would-be purchasers believed, incorrectly, that the LOVE image was copyright protected so that if a purchaser wanted to use that image on its product and had acquired a license from Defendants to so do, that image on that product was protected from imitation by another competitor selling the same product. American Image, in its marketing of the competing HOPE image, did not claim that HOPE was copyrighted and thus HOPE did not have the same appeal to those who would license that image for use on their products.

2

6.      By their years-long false claims about owning and controlling a LOVE copyright, and charging licensing fees for the use of that "copyright," the Defendants and the others named below have engaged in false designation of origin and false advertising under the Lanham Act (15 U.S.C section 1125(a)) and have engaged in a repeated and sustained scheme to obtain money by false pretenses from the above-described licensees, using wire communications in interstate and foreign commerce to further their scheme to defraud, in violation in of 18 U.S.C. section 1343; and have committed repeated acts of money laundering and illegal monetary transactions in violation of 18 U.S.C. section 1956 and 1957.

7.      These repeated actions also constitute a pattern of racketeering activity and crimes pursuant to the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961, *et seq.*), all engaged in by the Defendants and the other Participants named herein who, as shown below, each conducted and participated in this illegal activity in the manner alleged in this Complaint which constitutes an enterprise within the meaning of 18 U.S.C. section 1961 and is therefore a violation of 18 U.S.C. section 1962(c) and (d); and they are thus liable to American Image, under 18 U.S.C. section 1964, for the injury to its business and property caused by this enterprise.

### The Parties

8.      Plaintiff Michael McKenzie *dba* American Image Art ("American Image") is an art publisher, artist and writer operating from his home and studios located in Katonah, New York, and New York City, New York, both within this District.

9.      Defendant Artists Rights Society, Inc. ("ARS") is a New York corporation having its principal place of business in New York City, New York and specifically having an office at 65 Bleecker Street, within this District.

10.     Janet Hicks ("Hicks") is a Senior Vice President of ARS and she works from the ARS Office in New York City, within this District. In relation to the actions of ARS described below, Hick acts and speaks for ARS as its principal officer and employee dealing with the many copyrights it controls. Specifically, Hicks is principally responsible for the fraudulent licenses of the fraudulently claimed LOVE copyrights that ARS licenses to others in combination with the other participating people and entities named below. Her actions and statements referred to below thus bind ARS under the doctrine of *respondeat superior* because ARS authorizes her to do so.

**Other Participants in The Fraudulent Copyright Scheme and RICO Enterprise**

11.     The persons and entities named below in paragraphs 11 through 16 are all Participants in the fraud perpetrated by the Defendants named above and combined with those Defendants to form and act as the enterprise described below to commit the predicate actions forming the pattern of racketeering described herein and which injured the business and property of AIA.

12.     Morgan Art Foundation Limited ("Morgan"), not a party herein, is a Bahamas limited liability company which has its principal offices in New York, New York.

13.     Shearbrook (US) LLC ("Shearbrook"), not a party herein, is a New York limited liability company which has its principal offices in New York, New York and is controlled by Simon Salama-Caro in combination with Morgan. Shearbrook employs Defendant Emeline Salama-Caro as the project director for Robert Indiana Catalogue Raisonné project, a project supposedly arising from an agreement on December 2, 2006 between Robert Indiana and Simon Salama-Caro through which Indiana granted Simon Salama-Caro limited authority to be "responsible for the preparation of the Catalogue Raisonne" of Indiana's complete works of art

but did not in this context grant Morgan any copyright or trademark on any of Indiana's artworks.

14.     Figure 5 Art LLC ("Figure 5"), not a party herein, is a New York limited liability company which has its principal offices in New York, New York and owns and operates the website www.robertindiana.com which, along with other Participants and specifically Emeline Salama-Caro makes repeated false representations by wire communications in interstate commerce including that certain Robert Indiana artwork is protected by copyrights owned by Morgan; and specifically asserts by such wire communications that the LOVE image is protected by a copyright owned by Morgan and ARS. Figure 5 is used as a vehicle to promote the Robert Indiana artwork and to generate interest in that artwork in which Morgan, Shearbrook, ARS, Hicks, Grossglauser and the Salama-Caro family members named herein have a commercial interest, and this promotion includes the repeated false assertions that these parties own copyrights to Indiana's artwork, including a copyright on the LOVE image, despite the facts that, as they all well know, there is no such copyright.

15.     Simon Salama-Caro, not a party herein, resides in New York, New York and works from his New York City home and the Morgan office in New York City. Defendant Simon Salama-Caro holds himself out to be an agent of Morgan, speaking for Morgan on all manner of subject matters, including the false representations and promises alleged herein, and his actions and statements thus bind Morgan under the doctrine of *respondeat superior* because Morgan authorizes him to do so. At all relevant times Simon Salama-Caro was an agent for Morgan and acted on behalf of Morgan in causing the fraudulent licensing engaged in by ARS in combination with Defendant Hicks.

16.     Emeline Salama-Caro, not a party herein, is the daughter of Simon Salama-Caro, resides in New York, New York and works in combination with Shearbrook (US), LLC as the project director for Robert Indiana Catalogue Raisonné project. That project is also promoted on the website www.robertindiana.com, a website overseen by Simon Salama-Caro, Emeline Salama-Caro, Shearbrook and Figure 5, and on which website Emeline Salama-Caro is listed as the sole contact person (at the address emeline@robertindiana.com). Emeline Salama-Caro is the agent of and has held herself out to be an agent of Morgan, Shearbrook, and Figure 5, speaking for each of them on matters relating to Robert Indiana artwork and alleged copyrights, including the false representations and promises alleged herein, and her actions and statements thus bind Morgan, Shearbrook, and Figure 5 under the doctrine of *respondeat superior*.

17.     Phillippe Grossglauser, not a party herein, is the sole director of Morgan, having his residence in or around Geneva, Switzerland. Defendant Grossglauser holds himself out to be an agent of Morgan, speaking for Morgan on all manner of matters, including the false representations and promises alleged herein in relation to the fraudulently claimed copyright to the LOVE image. His actions and statements thus bind Morgan under the doctrine of *respondeat superior* because Morgan authorizes him to do so. At all relevant times Phillippe Grossglauser was in fact an agent for Morgan and acted on behalf of Morgan in causing the fraudulent licensing engaged in by ARS in combination with Defendant Morgan, all as alleged below, and he is therefore liable for all the wrongful conduct alleged herein as well as causing Morgan to be liable therefore.

**Jurisdiction and Venue**

18.     This Court has subject matter jurisdiction over this case because the claims stated in Counts I and II arise under the laws of the United States, specifically under the Lanham Act

(15 U.S.C, section 1125(a) (Count I) and under the RICO statute (18 U.S.C. §1961 *et seq.),*

Count II.

19.     Venue is proper in this District under 28 U.S.C. §1391 because the Defendants

reside within this District and a substantial part of the events or omissions giving rise to the

claims made herein occurred within this District.

**Facts Applicable to Both Counts**

**Defendants' False Claim to a LOVE Copyright**

20.     Robert Indiana was an exhibiting artist who came from the midwest, moved to

New York in the 1950s and then, in 1976, moved to Vinalhaven, Maine where he lived in

relative isolation while still creating his art until his death on May 19, 2018. He was part of the

American "pop art" movement of the 1960s.

21.     While Indiana created many notable and acclaimed works of art, his most famous

was his LOVE creation which thereafter was published in all forms of art, such as paintings and

sculptures, on a postage stamp, and on greeting cards. More recently, the LOVE image has been

used as a promotional tool on everything from t-shirts to trinkets, such as LOVE salt and pepper

shakers, pencil sharpeners, glassware and the like.

22.     The LOVE image was always a popular image but it was made more so after

Defendants and Participants commenced fraudulently marketing it as subject to copyright

protection. That caused it to be perceived as more valuable to those who would license it for use

on their products because those who would use the LOVE image in connection with their

products believed, falsely, that it was protected from use on competing products. So if, say, two

marketers of beer mugs were in competition with each other and one had a LOVE image

embossed on its mug, with a copyright notice on it, that would enhance its value in the

marketplace given the popularity of that image and would appear to prevent the competitor from embossing the LOVE image on his or her competing mug.

    23.    The LOVE image has from its first publication been as depicted here:



    24.    Indiana did not copyright the LOVE image. Indiana published the LOVE image repeatedly for decades on statues publicly displayed, in all other forms of artwork, on greeting cards, billboards publicly displayed, and always doing so without any assertion that it was subject to a copyright.

    25.    As Defendant Morgan has recently admitted under oath in a court proceeding within this District about the breadth of Indiana's publication of LOVE:

The year 1964 was a key moment that would mark an even higher level of fame for Robert Indiana: he created a work depicting four colored letters, L-O-V-E, with the "LO" stacked on the "VE" and the "O" notably tilted outward to the right. The image, called *LOVE*, went viral. It originated as a work on paper and was then used by Indiana in paintings and sculpture. It was published on posters and plastered on commercial products. It was selected for a Christmas card published by The Museum of Modern Art. It was translated by Indiana into new original artworks depicting the *LOVE* image in multiple other languages, including Hebrew, Spanish, and Chinese. It became one of the most recognizable sculptures in the world and was placed in various public spaces, including the well-known "Love Park" in Philadelphia, Pennsylvania. In 1973, the U.S. Postal Service printed 330 million U.S. postage stamps bearing the *LOVE* image.

26.     None of these publications asserted a copyright to the LOVE image nor could they because there was none. These repeated publications of the LOVE image over many years without any notice of copyright clearly meant, and means, as is obvious to anyone involved in the art world and as was surely well known at all relevant times to all the Defendants and Participants named herein, that LOVE is and has been for many decades in the public domain, ever since Indiana began to publish it without asserting any copyright, and it was never and is not subject to any copyright belonging to Indiana or to anyone else.

27.     Thus, the image LOVE is in the public domain.

28.     Sometime in 1999, Morgan, and its agent Simon Salama-Caro, persuaded Indiana that Morgan could effectively promote his artwork and as a result Indiana gave Morgan and Salama-Caro authority to promote a substantial amount of his artwork, including the LOVE image. However, Indiana never granted to Morgan any copyright in relation to the LOVE image because Indiana never had such a copyright to convey. Similarly, Indiana did not have copyrights to other of Indiana's images such as ART, EAT, USA FUN, Numbers and numerous other Indiana artworks which, like LOVE, were in the public domain, not copyrightable and not copyrighted.

29.     Indiana and Morgan entered into two contracts.  In the first contract, dated April 9, 1999, and made effective as of June 28, 1998, Indiana purported to convey to Morgan all "copyright, trademark, and other rights" in certain images (LOVE, AHAVA, AMOR, NUMBERS, and YALE) and the art included in two catalogues -- the Susan Sheehan Print Catalogue Raisonne and the catalogue from an exhibition held at the Museum of Modern and Contemporary Art in Nice, France -- and purportedly granted Morgan the exclusive right to reproduce, promote, and sell these images throughout the world. Morgan claims that this contract was later amended to extend to all paintings and sculptures conceived by Indiana from 1960 to April 2004, the date of amendment. In the second contract, dated December 22, 1999, and made effective as of July 27, 1995, Indiana purported to convey to Morgan the exclusive right to "produce and fabricate," own, and sell sculptures of LOVE, AHAVA, AMOR, NUMBERS (ONE through ZERO), ART, and 2000.

30.     Under both agreements, Morgan claims the right to sue for any infringement of the rights Indiana conveyed. However, none of the above works of art were the subject of copyrights as Morgan and Indiana well knew.

31.     After obtaining the above-described, purported authority to do so, Morgan sought out ARS in an effort to license Indiana artwork. ARS is an entity that represents the rights of over 10,000 artists as its members and on behalf of each of those members it markets and licenses their artwork (asserting copyrights and trademarks as authority for doing so) worldwide in various ways acceptable to each member and within the context of purported legal rights, including copyrights. It is highly sophisticated and informed in the law relating to artists' rights, and particularly copyrights.

32.     One of the principal ways in which ARS generates income, indeed millions of

dollars of income, from artwork is by its licensing operation. ARS licenses the use of the artwork

of those artists, or their agents or representatives, who have granted ARS authority under

copyrights, trademarks or both, to ARS to do so and to license use of their copyrights or

trademarks to anyone willing to enter a licensing agreement with ARS and pay ARS a fee.

33.     Such licenses allow the licensees to use the artwork image of the artist involved

on the product marketed by that licensee. Such products range from printed materials such as

calendars, greeting cards, and posters, to all manner of merchandise of such disparate kinds as

bookends, pencil sharpeners, glassware, figurines, and all manner of trinkets, as well as through

use in movies and television.

34.     Under these ARS licenses, the licensee owes a fee to ARS and that fee is often a

percentage of the monies earned for all products sold by the licensee that bear the licensed image

of the artist involved. ARS will then split that fee between itself and the artist (or agent or

representative) whose image has been licensed. ARS licenses have been issued to thousands of

users throughout the United States and internationally.

35.     After becoming Indiana's promoter for some of his artwork, Morgan sought to

have ARS use its licensing operation to market Indiana's artwork images, most notably the

LOVE image, that being the best known and most popular image.

36.     In its discussions with ARS, Morgan, through Salama-Caro and Grossglauser,

discussed that they would enter an agreement to market the LOVE image, and other images, as

copyrighted even though there was no such copyright. Marketing a license as if the image

involved was copyrighted makes the license more saleable since, without copyright protection,

there would be less appeal to any would-be licensee to pay for use the image involved since it

11

could be equally used by his or her competitors and thus would not be any special enhancement to the product on which the LOVE image would be embossed or affixed.

37.   The agreement between Morgan and ARS, dated March 1, 1999, referred to copyrights supposedly owned by Morgan and ARS on the Indiana artwork. Under this agreement ARS could license Indiana artwork, most notably the LOVE image. That agreement is attached as Exhibit A hereto and adopted herein in its entirety by reference as if specifically pleaded in its entirety. In that agreement, which continues today and which forms the basis for the repeated fraudulent acts alleged herein, at paragraph 1, Morgan makes the following false representation knowing, as did Hicks and ARS, that it was false:

> Morgan hereby represents and warrants that it is the sole and exclusive owner of the worldwide rights to reproduce, promote, license and sell images of works (the "Works") created by Robert Indiana, and that the June 28, 1998 agreement between Robert Indiana and Morgan granting said rights is and during the term of this agreement will remain in full force and effect.

38.   As they relate to Indiana's most famous art image, LOVE, as well as to other artwork of Indiana, the above-quoted representation and warranty are knowingly false because, as Salama-Caro, Grossglauser, Morgan, Hicks and ARS then well knew, and have known ever since, the LOVE image was in the public domain at that time, never having been copyrighted. It also, as they well knew, remains in the public image, and therefore Morgan was not, as it relates to the LOVE image, and other images "the sole and exclusive owner of the worldwide rights to reproduce, promote, license and sell images of works (the "Works") created by Robert Indiana."

39.   The ARS/Morgan Agreement (Exhibit A), which remains in effect as of the date of this Verified Complaint, is used as a pretext for ARS to license images of any of the Indiana artwork, including the LOVE image, and as a pretext for its claim, made to potential licensees, that is authorized to seek such licenses from all manner of licensees, that it has authority to license copyrighted Indiana art images, including mostly and most notably, the LOVE image, to

the licensee for use on items for sale for profit by that licensee. These items include, for example, posters, calendars, greeting cards, postcards, merchandise and products, advertising, monographs, book and magazine covers and inserts, promotional materials and electronic media. (*See*, Exhibit A, ARS Morgan Agreement, at paragraph 5.)

40.     Moreover, in the ARS/Morgan Agreement, Salama-Caro and ARS agreed that any license issued by ARS of any LOVE image to any licensee must require that licensee to place on any product licensed by that licensee a false written assertion that the LOVE image was the subject of a copyright owned by Morgan and ARS. The specific provision of the ARS/Morgan Agreement requiring this false copyright assertion is in paragraph 8 thereof and reads as follows:

> ARS shall include as a condition of each license a requirement that the following copyright notice accompany the licensed reproduction:
>
> [year of publication] Morgan Art Foundation, Ltd. /Artists Rights Society (ARS), New York.

41.     In relation to any license thereafter conferred by ARS of the LOVE image for use on any item sold by any licensee, the above-quoted provision was an agreement between the Defendants and Morgan, Salama-Caro, and the other Participants to commit fraud on any and all members of the public who became licensees, and on any and all members of the public who thereafter purchased any of the products offered by these licensees that contained the LOVE image and the false assertion that it was the subject of a copyright. No such copyright existed as all Defendants and Participants well knew at the time they entered into the License Agreement and at all times since then up, to and including the date of this Complaint.

42.     Licenses issued under the ARS/Morgan Agreement that involved the LOVE image included a written assertion in it that the licensee would state, in relation to any products offered for sale by that licensee bearing the LOVE image, that the LOVE image was the subject

of a copyright owned jointly by Morgan and ARS. Such an agreement would also require any

product sold by any licensee have embossed on it the copyright assertion as exemplified next

below, The LOVE image itself is depicted in the small statuette on the left and on the right is

depicted the bottom of that statuette which contains the assertion that the image is copyrighted to

Morgan and ARS, a false assertion:



43.     The fraud perpetrated by ARS, Hicks and the Participants in selling these licenses

was and remains ongoing. The ongoing sales of these fraudulently procured licenses is extensive

and ongoing as of the date of this Verified Complaint. Everyone who became a licensee of

products that were to bear the LOVE copyright assertion did so after receiving the knowingly

false and fraudulent representation that the LOVE image was exclusive to Morgan, and to ARS,

and that it was only available by and through them and worth paying money for under a license

agreement so that the licensees could have permission to market the highly popular LOVE image

as part of their products.

44.     Moreover, that fraud also caused the licensees to believe that without paying money for a license to use the LOVE image, and without thereafter paying royalties on the sales of the items subject to that license, that licensee was not allowed by law to use the LOVE image on its products. All the money paid by all the licensees in relation to all products thus sold was procured by the fraud of ARS and Hicks in combination with the Participants who publicly sold this lie by use of wire communications in interstate and foreign commerce and still do so in the manner described below.

45.     Moreover, all the consumers who purchased any of the licensees' products that had the LOVE image on these products purchased the products believing that they were the subject of a copyright when they were not.

46.     ARS has collected massive amounts of royalties using these fraudulent licenses and has shared them with Morgan who by contract shared these fraudulently acquired fees with Robert Indiana.

47.     Further, the widespread sale of these fraudulent licenses unfairly raised the market value of LOVE artwork and its presence in the marketplace, while at the same time diminished the value and thus the marketability of the Indiana works produced fairly by Michael McKenzie/American Image, including the HOPE image that was marketed by them honestly. In fact, ARS rejected McKenzie and the work he produced for licensing, stating to McKenzie that it would be a conflict of interest with Morgan and, further, McKenzie was rejected by the other major licensing organization operating, VAGA, which cited that the market for Robert Indiana was already saturated by ARS and LOVE and because the LOVE image had the substantially added value of coming with a copyright.

48.     The unfair advantage of LOVE over HOPE was that LOVE was marketed as if it was protected by a copyright whereas the most prominent artwork produced by AIA was the HOPE image which AIA did not market as if it was copyrighted – AIA and McKenzie not being the fraudsters that the Defendants and the Participants have been.

49.     This deprived McKenzie/American Image of the national and international advertising that invariably accompanies commercial products, which in turn serves to make the artworks produced more well known to a larger audience and thus more valuable. LOVE, by its fraudulent assertion of copyright, gained an unfair presence in the market and diminished – destroyed really - the ability of HOPE to obtain vital licensing presence in the market, forcing American Image to spent hundreds of thousands of dollars on advertising, promotion and third-party distribution rather than gain income from licenses that would have more effectively promoted the American Image and HOPE brand. Simply put, there was no way that HOPE, honestly marketed, could compete with LOVE dishonestly marketed as if it had the valuable protection of a copyright when in fact it did not.

50.     Participants Morgan, Shearbrook, Figure 5, Simon Salama-Caro, and Emeline Salama-Caro have also used the interstate wires to publish a website, *RobertIndiana.com,* disseminating the same false claims that Morgan is the copyright holder of LOVE. Further, they have used this website and their fraudulent assertion of copyright to induce The Albright Knox Museum to initiate the Robert Indiana Catalogue Raisonné, full of fraudulent copyright assertions relating to LOVE and thus putting at risk the good reputation of a fine Museum. Morgan and Shearbrook have also repeatedly posted false assertions about the LOVE copyright, which furthers the fraud described herein.

51.     Additionally, on information and belief, Defendants Morgan and Simon Salama-Caro, directly or indirectly through their agents, caused to be published through interstate wires additional misrepresentations in an Associated Press article entitled "Copyright Holder Settles Lawsuit with LOVE Artist's Estate" on June 11, 2021 (by correspondent David Sharp) which falsely stated that Morgan is the "copyright holder" in the title and goes on to make the false assertion that Morgan is holding the copyright on LOVE in the opening paragraph of the article:

> The estate of pop artist Robert Indiana has reached a settlement that keeps intact a longstanding relationship with Morgan Art Foundation, which holds the copyright for his iconic 1960s "LOVE" series, to promote and preserve his work, officials said Friday.

This false assertion of the copyright ownership was caused by Morgan and its agents to be sent by AP wire communication in interstate commerce on and after June 11, 2021 and furthered the fraudulent scheme of obtaining money by false and fraudulent pretenses by reinforcing the false belief in the public that Morgan owned a copyright to the LOVE image.

**American Image's Injury from Defendants' Conduct**

52.     Plaintiff Michael Mckenzie is an artist, art publisher, author, and longtime Indiana publisher and collaborator.

53.     In 2007, he created the HOPE image and then worked with Indiana to make versions of the HOPE image, with its form similar to the LOVE image, such as is depicted here:

17



54.     In 2007, then presidential hopeful Barack Obama adopted "Hope" as the theme of his presidential campaign.

55.     In 2008, McKenzie, who had contacts within the Obama presidential campaign, presented to them the HOPE image depicted above and the campaign decided to exhibit a massive HOPE sculpture using McKenzie's form in Indiana's choice of material, which was stainless steel. This large sculptured HOPE image was placed at the entrance to the 2008 Democratic nominating convention in Denver, Colorado as emblematic of the "Hope" theme of Barack Obama. Its use during that nominating convention, placed as it was at the entrance to the convention hall, caused it to be seen repeatedly by millions of people and thus rendered it a

highly visible and a highly popular image. It became an image competing with the LOVE image. It was subject of many potential licenses such as the kind described above in relation to the LOVE image. Like the LOVE image, it was not copyrighted.

56.     Because of the promise of the HOPE image, on August 11, 2008, McKenzie and Indiana entered into an agreement under which McKenzie and American Image became exclusive producers of the HOPE image for Indiana.

57.     Indiana and McKenzie began producing the HOPE image and selling that image. Because it was not copyrighted, McKenzie did not claim that it was copyrighted.

58.     Because of HOPE's similarities in form and overall design to the LOVE image, and HOPE's creation by the same artist, Robert Indiana, HOPE and LOVE became competitive symbols. While LOVE was clearly the more popular at the time, the HOPE image appealed to the same audience given the similarity of the two images and the similarly inspiring effect of the words HOPE and LOVE.

59.     The producer of LOVE, Morgan, and the producer of HOPE, American Image, therefor became and remain competitors for the same audience and prospective purchasers because of the similarities of the two images and their similar appeal.

60.     The mass marketing of LOVE image licenses by ARS in combination with the Participants has greatly and unfairly enhanced the LOVE image at the expense of the HOPE image. ARS is the most prominent licensing entity for art and licensing by it creates advertising and public visibility which promotes the art involved.

61.     Moreover, marketing an image with the assertion that it is copyrighted gives it more value because the person to whom it is licensed, for whatever use he or she puts it, can protect that use from imitation by a competitor under the copyright laws.

62.     The use by ARS in combination with the other Participants of the false copyright assertion in relation to its many licenses of the LOVE image has greatly enhanced the revenues derived from the LOVE image and made it appear more valuable than the HOPE image given its supposedly copyright-protected status and the extensive public visibility it has acquired through the fraudulent assertion that LOVE had copyright protection.

63.     That enhancement has in turn injured the business and property of American Image and the competing HOPE image, given the popularity of LOVE as enhanced by the false copyright assertion and the refusal of any of the major art image licensing entities, including both ARS and VAGA, the two giants, to offer HOPE image licensing to American Image, given its lesser popularity because it was not said to be copyrighted and because ARS, through Janet Hicks, was told not to do so by American Image's competitor, Morgan, and she acquiesced in that instruction.

64.     The fraudulent licensing of the LOVE image has therefore injured the business and property of American Image in that it has been deprived of many licensees for the HOPE image that have been refused by those doing the licensing in light of how well the far too widespread licensing of the LOVE image had grown and because the HOPE image could not compete with the assertion that the LOVE image had the added advantage over HOPE of being protected by copyright.

## COUNT I

### (Lanham Act Violations by All Defendants)

65.     Plaintiff adopts by reference and repeat each and every allegation made above as if they were specifically repleaded herein in their entirety.

66.     Janet Hicks is the principal officer at ARS who issues the fraudulent LOVE image licenses, monitors the licensed sales under those licenses, collects the license payments sent in by the licensees and then makes the payments to Morgan for Morgan's share of those fraudulently procured payments.

67.     The false assertions by Defendant Janet Hicks for herself and on behalf of ARS and Morgan that they owned a copyright to the LOVE image (and other Indiana images) when they did not own any such copyright is a violation of the false designation of origin and the false advertising or promotion provisions of the Lanham Act, 15 U.S.C. sections 1125(a)(1)(A) and 1125(a)(1)(B), because Defendants have each participated in the representation to all potential licensees that Morgan and ARS owed the copyright to the LOVE image and that ARS was authorized to license said copyright.

68.     This false assertion caused the affixation of a false copyright notice on thousands of products under many hundreds of licenses requiring such affixation.

69.     This requirement was intended to and did deceive the general public and the relevant market that the LOVE image was in fact the subject of a copyright when it was not.

70.     By reason of these ongoing and repeated violations of the Lanham Act, Plaintiff American Image has been damaged in the amounts to be proven at trial, which is at least $10,000,000 (ten million dollars) in lost license revenues and American Image is  entitled to those damages, trebled, attorneys fees and to an injunction prohibiting Defendants from selling or offering for sale, or causing any licensee to sell or offer for sale, any product bearing the LOVE image with the representation that said image is copyrighted.

71.     Moreover, Defendants should also be mandatorily enjoined to notify each licensee whom they defrauded in the manner described above that despite any representation in the past, the LOVE image is not now and has never been the subject of any copyright.

## COUNT II

## (Violation of the RICO statute)

72.     Plaintiff adopts by reference and repeat each and every allegation made above as if they were specifically repleaded herein in their entirety.

73.     Pursuant to 18 U.S.C. §1962(c), it is unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." And pursuant to 18 U.S.C. §1962(d), it is unlawful "for any person to conspire to violate any of the provisions of subsections . . . (b), or (c) of [§1962]."

74.     The course of conduct described in paragraphs 1 through 70 above constitutes a violation by all Defendants and Participants of 18 U.S.C. §§1962(c) and (d). The Defendants engaged in a pattern of wrongful conduct involving mail and wire fraud, money laundering, and illegal monetary transactions with unlawful proceeds (the "Predicate Acts") to gain money from their illegal and fraudulent scheme to market the LOVE image as a copyrighted image when at all times they well knew it was not.

75.     Further, the Defendants combined together to engage in a pattern of wrongful conduct involving the Predicate Acts to conduct or participate, directly or indirectly, in the conduct of the conspiracy to further the Predicate Acts involving their fraudulent use of the LOVE image.

76.    **Predicate Acts.** The many, repeated and ongoing predicate acts include the following:

77.    ARS, in combination with Janet Hicks, Morgan, Grossglauser, and the other Participants  has issued or assisted with the issuance of many hundreds of the above-described, fraudulently-procured  licenses to licensees "allowing" use by those licensees, for money paid to ARS and passed on the Participants, of the LOVE image under the false and fraudulent pretense that these licenses, and the money paid by the licensees for them, were necessary to allow these licensees to use the image of LOVE on their products.

78.    Many hundreds of licenses have been issued under this fraudulent pretense and these licenses have been issued by ARS and Hicks by use of interstate wire communications by which these licenses were sent to the licensees. Many hundreds of these licenses continue in effect as of the date of this Verified Complaint. The sending of each license from ARS to each licensee was a wire communication in interstate commerce or in foreign commerce as some of the licensees are outside the United States and its territories.

79.    In addition, from the time that many of these licensees started selling his or her products under these fraudulently procured licenses and used the LOVE image on the products sold, each licensee has paid to ARS, monthly or quarterly or in some other time period, the amount specified in the license to be due for each licensed sale of a product bearing the LOVE image. Most such payments have been and continue to be sent by a bank wire transfer from the licensee involved to ARS, which are each wire communications in interstate commerce, or in foreign commerce as some of the licensees are outside the United States and its territories. These payments by wire transfer have resulted in many hundreds if not thousands of such wire communications in interstate or foreign commerce from the licensees to ARS. All of these wire

communications are in furtherance of the fraud described above and many of these ongoing wire communications continue as of the date of this Verified Complaint. Each such wire communication is a separate violation of 18 U.S.C. section 1343 and collectively the many hundreds if not thousands of them constitute a pattern of such violations, each of which is a predicate act under the RICO statute.

80.     In addition, each month, quarter, or other time period since this licensing began and continuing to the date of this Verified Complaint, ARS has paid to Morgan 75% of the license fees ARS has received from the licensees for the sales occurring the previous month, quarter or other time period of the products bearing the LOVE image. Each of the payments by ARS to Morgan has been by bank wire transfer sent by wire communications in interstate commerce. These wire communications have been repeated many times periodically year in and year out by ARS to Morgan from the proceeds of payments received by ARS from its licensees. All of these wire communications are in furtherance of the fraud described above and many of these ongoing wire communications continue as of the date of this Verified Complaint. Each such wire communication is a separate violation of 18 U.S.C. section 1343 and collectively the many hundreds if not thousands of them constitute a pattern of such violations, each of which is a predicate act under the RICO statute.

81.     The wire transfers referred to above have been sent repeatedly for many years and in the last four years have amounted to many hundreds if not thousands of wirings in interstate and foreign commerce.

82.     All of the above-referenced wire communications sent in interstate and foreign commerce were in furtherance of the scheme and artifice to defraud described above. This fraud was perpetrated on both the licensees who paid money for use on its products of the LOVE

image, on the general public which saw offerings of all the products for sale, upon those many persons who purchased products from the licensees bearing the LOVE image and bearing the false copyright assertion on the products involved and all of this amounts to an ongoing the wire fraud under 18 U.S.C. section 1343.

83.    **Repeated Acts of Wire Fraud.** The conduct of the Defendants described herein constitutes repeated acts of wire fraud in violation of 18 U.S.C. §1343 in that: the Defendants participated in a scheme or artifice to defraud as described above and they used the wire communications in interstate and foreign commerce to further that scheme by their causing to be sent and by the acceptance of payments made by licensees to ARS through bank wirings which were wire communications in interstate and foreign commerce which were for the purpose of executing the scheme to defraud by collecting fraudulently procured money from the licensees. The wirings were thus used on a regular, continuous and systematic basis in connection with the implementation and execution of the fraud alleged and that use continues as of the date of this Verified Complaint.

84.    **Repeated Acts of Mail Fraud.** The conduct of the Defendants described herein also constitutes mail fraud in violation of 18 U.S.C. §1341 in that: (a) the Defendants participated in a scheme or artifice to defraud as described above and then used the United States mails to further that scheme by causing payments made by licensees to be sent through the mail (if they were not sent by interstate wire communication) and Defendants, or someone associated with the scheme, used the mails or caused the mails to be used, by causing to be placed in an authorized depository for mail a letter intended to be sent or delivered by the United States Postal Service; and the use of the mails was for the purpose of executing the scheme by collecting fraudulently procured money from the licensees. The United States mails were thus used on a

regular, continuous and systematic basis in connection with the furtherance of the fraud alleged and that use continues as of the date of this Verified Complaint.

85.     The above-referenced use of the United States mails and wire communications in interstate and foreign commerce were and continue to be a pattern because they were repeated each month or quarter, or some other period of time, of each year that each license was or remains in effect because each month, quarter or other period of time each licensee mailed or wired to ARS the license fees due for the sale of the products involved, and then each month, quarter or other applicable period of time ARS would in turn send a separate bank wire, being a wire communication in interstate commerce, to Morgan with Morgan's portion of the agreed upon split of the fraudulently procured licensing fees. This has amounted to many hundreds if not thousands of wire transfers and mailings.

86.     **Repeated Acts of Money Laundering.** When the fraudulently procured money described above was received by ARS from the licensees, it was sent by Janet Hicks by bank wire transfer in interstate commerce or by monetary instruments from ARS to Morgan.

87.     These wire transfers were not only additional interstate wire communications in violation of the wire fraud statute, each of these wirings from AHS to Morgan constitutes money laundering in violation of  18 U.S.C. §1956(a) in that ARS and Hicks, in combination with the other Participants, unlawfully obtained proceeds from its fraud on the licensees by the money they sent ARS and then sent those monies in a transaction that affected interstate commerce (1) involving the movement of funds by wire or other means, or (2) involving one or more monetary instruments, or (3) involving a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate commerce; and doing so knowing that the funds involved in these financial transactions represented the proceeds of some form of unlawful

activity, and conducted or attempted to conduct a financial transaction which in fact involved the proceeds of a violation of 18 U.S.C. §§1341 or 1343 as alleged above, both of which are specified unlawful activities, and Defendants and Participants did so with the intent to promote the carrying on of these specified unlawful activities; all of which constitutes money laundering in violation of 18 U.S.C. §1956(a).

88.    **Repeated Monetary Transactions with Unlawful Proceeds**. The course of conduct set forth above constitutes violations by defendants of 18 U.S.C. §1957 in that Defendant ARS and Hicks, in combination with the Participants in the manner described above, (i) unlawfully obtained proceeds from an unlawful scheme to defraud, (ii) knowingly engaged in or attempted to engage in a monetary transaction (the deposit, withdrawal, transfer, or exchange, in or affecting interstate commerce, of funds or a monetary instrument by, through, or to a financial institution which is engaged in, or the activities of which affect, interstate commerce in any way or degree) in connection with the acquisition of property of a value greater than $10,000; and (iii) the funds involved were proceeds of a violation of specified unlawful activity (as defined under 18 U.S.C. §1956 to include mail fraud and wire fraud), all in violation of 18 U.S.C. §1957.

89.    The criminal activities referred to above have been repeated and continuous since many years ago and are continuing as of the date of this Verified Compliant and are therefore a pattern of racketeering activity within the meaning of 18 U.S.C. section 1961(1) which is ongoing, which defrauds the public, and which will continue to do so unless enjoined by this Court and which also has injured American Image in its business and property in the manner described above..

90.     Simon Salama-Caro, Emeline Salama-Caro, Grossglauser, Morgan, Shearbrook, Figure 5 Art LLC, ARS and Janet Hick have associated in fact together to become an enterprise which has, through the licensing operation of ARS, engaged in the predicate acts alleged above.

91.     Janet Hicks and ARS have actively participated in the enterprise and furthered its purposes by setting up or causing to be set up the fraudulently procured licenses, by monitoring the ongoing fraudulently procured license payments under each of those licenses and by paying out or causing to be paid out to Morgan its share of the fraudulent proceeds obtained by the enterprise.

92.     Participants Morgan, Simon Salama-Caro, and Grossglauser have participated in the enterprise and furthered its purposes by approving the fraudulently obtained licenses, consulting with Hicks on each of these fraudulently procured licenses and by accepting and then using the fraudulently obtained proceeds of the enterprise and all of this activity has been in or has affected interstate commerce within the meaning of 18 U.S.C. §1961; and also by causing to be communicated in the press the false assertion that Morgan was the copyright holder of the LOVE image.

93.     Participants Emeline Salama-Caro, Shearbrook, and Figure 5 Art LLC have participated in the enterprise and furthered its purposes by fraudulently posting repeatedly on websites in interstate commerce that LOVE was the subject of a copyright and that it was owned by Morgan and ARS which they well knew to be false.

94.     Pursuant to 18 U.S.C. §1962(d) and 18 U.S.C. §2, Defendants Morgan, Emeline Salama-Caro, Simon Salama-Caro and Grossglauser, as co-conspirators with Hicks and ARS acted in concert with each other under an agreement to commit the predicate acts alleged above within the meaning of 18 U.S.C. section 371 and by the many overt acts alleged above to further

the conspiracy. They also aided, abetted and procured the predicate acts alleged above within the meaning of 18 U.S.C. section 2 and are thus liable for each of the predicate acts alleged above.

95.     **Injury to the Business and Property of American Image.** By reason of all the forgoing, American Image has been injured in its business and property and is therefore entitled, pursuant to 18 U.S.C, section 1964, to recover for such injury such damages from that injury as are proven at trial, as a result of lost revenues resulting from an inability to obtain licensing, as well as other lost sales, the value of which is at least $10,000,000 (ten million dollars), trebled as provided by law, and an award of attorneys' fees and costs.

WHEREFORE, McKenzie and American Image seek judgment as follows:

A.      An order and judgment awarding damages to Plaintiff for his consequential damages as are proven to the jury at trial;

B.      An order and judgment awarding Plaintiff treble damages as allowed by law;

C.      An order and judgment awarding Plaintiff reasonable attorneys' fees as allowed by law;

D.      A permanent injunction prohibiting Defendants or their agents or those acting in concert with them from representing to anyone anywhere that any of the Defendants or Participants have ownership rights to a copyright of the LOVE image or of any other Indiana image and from representing that any such copyright exists;

E.      A permanent mandatory injunction ordering Defendants to notify in writing each licensee of any ARS license of the LOVE image or any other Indiana image that none of the Defendants have ownership rights to a copyright of the LOVE image or any other Indiana image and notifying them that no such copyright exists;

29

F.      An order and judgment awarding plaintiffs the taxable costs of this lawsuit; and

G.      An order and judgment for such other and further relief as to this Court seems just
and proper.

## Demand for Jury Trial

Pursuant to Rule 38(a), Federal Rules of Civil Procedure, Plaintiff demands trial by jury
on all issues so triable.

## Verification

Michael McKenzie declares under penalty of perjury that to the best of his knowledge
and belief, the fact allegations in this Verified Complaint are true.

Executed this 27th day of February, 2022 in Naples, Florida.

*/s/ Michael McKenzie*
Michael McKenzie


Dated: February 27, 2022                    Respectfully submitted,

/s/ *John J. E. Markham, II*
John J. E. Markham, II (JM4744)
Bridget A. Zerner (BZ2582)
MARKHAM READ ZERNER LLC
One Commercial Wharf West
Boston, Massachusetts 02110
Tel: (617) 523-6329
Fax: (617)742-8604
*jmarkham@markhamreadzerner.com*
*bzerner@markhamreadzerner.com*