# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MICHAEL MCKENZIE, INDIVIDUALLY AND DOING BUSINESS AS AMERICAN IMAGE ART, AN UNINCORPORATED DBA,

          Plaintiff,

vs.

ARTISTS RIGHTS SOCIETY, INC., AND JANET HICKS,

          Defendants.

Case No.: 1:22-cv-01619-MKV

## DEFENDANTS ARTIST RIGHTS SOCIETY, INC. AND JANET HICKS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

Scott J. Sholder, Esq.
Benjamin S. Halperin, Esq.
COWAN, DEBAETS, ABRAHAMS,
& SHEPPARD, LLP
41 Madison Avenue, 38th Floor
New York, New York 10010
Telephone: (212) 974-7474
Fax: (212) 974-8474

*Attorneys for Defendants Artists Rights Society, Inc. and Janet Hicks*

## **TABLE OF CONTENTS**

Table of Authorities ...........................................................................................ii

BACKGROUND ..............................................................................................2

ARGUMENT ..................................................................................................5

I.      PLAINTIFF'S CLAIMS ARE ALL TIME-BARRED............................................5

      A.      RICO's Four-Year Statute Of Limitations Bars Plaintiff's Claims............5

      B.      Plaintiff's Lanham Act Claims Are Barred By Laches. ...........................10

II.     PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER THE LANHAM

     ACT............................................................................................................11

      A.      Plaintiff's Claims Alleging Misrepresentations About Copyright Status
            Are Not Redressable Under The Lanham Act. ...........................................11

      B.      Plaintiff Fails To Plausibly Allege Proximate Causation Or Materiality..13

      C.      Plaintiff's False Advertising Claims Fail Because He Does Not Identify
            False Statements Made In Adverting Or Promotion.................................17

III.    PLAINTIFF FALLS FAR SHORT OF STATING A CIVIL RICO CLAIM. .......18

      A.      Plaintiff Has Not Adequately Pled Scienter................................................19

      B.      Plaintiff Fails To Plead Instances Of Mail Or Wire Fraud With
            Particularity................................................................................................22

      C.      Plaintiff Fails To Plead Proximate Causation............................................23

      D.      Plaintiff Fails To State A Civil RICO Conspiracy Claim..........................25

CONCLUSION................................................................................................25

# TABLE OF AUTHORITIES

Cases                                                                                    Page(s)

*7 West 57th St. Realty Co., LLC v. Citigroup, Inc.*,
  771 F. App'x 498 (2d Cir. 2019) ........................................................ 24

*Agence France Presse v. Morel*,
  769 F. Supp. 2d 295 (S.D.N.Y. 2011) ............................................... 13

*Alcon Vision, LLC v. Lens.com, Inc.*,
  2022 WL 1665453 (E.D.N.Y. May 25, 2022) ................................... 18

*Anatian v. Coutts Bank (Switzerland) Ltd.*,
  193 F.3d 85 (2d Cir. 1999) .......................................................... 19, 22

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006) .............................................................. 2, 23, 24

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................... 5, 15

*Avalos v. IAC/Interactivecorp.*,
  2014 WL 5493242 (S.D.N.Y. Oct. 30, 2014) ................................ 15-16

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................ 5

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ............................................................ 3

*Conopco, Inc. v. Campbell Soup Co.*,
  95 F.3d 187 (2d Cir.1996) ............................................................. 10

*Conte v. Newsday, Inc.*,
  2013 WL 978711 (E.D.N.Y. Mar. 13, 2013) ................................. 15, 17

*Crown Heights Jewish Comty. Council, Inc. v. Fischer*,
  63 F. Supp. 2d 231 (E.D.N.Y. 1999) ............................................... 22

*Crocs, Inc. v. Effervescent, Inc.*,
  2021 WL 4170997 (D. Colo. Sept. 14, 2021) ............................... 12-13

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
  539 U.S. 23 (2003) .......................................................... 1, 11, 13, 17

*Dependable Sales & Serv., Inc. v. TrueCar, Inc.*,
   377 F. Supp. 3d 337 (S.D.N.Y. 2019),
   *on reconsideration*, 394 F. Supp. 3d 368 (S.D.N.Y. 2019) ...................................... 14

*digiGAN, Inc. v. iValidate, Inc.*,
   2004 WL 203010 (S.D.N.Y. Feb. 3, 2004) ........................................................... 12

*DLJ Mortg. Capital, Inc. v. Kontogiannis*,
   726 F. Supp. 2d 225 (E.D.N.Y. 2010) ................................................................ 19

*Empire Merchants, LLC v. Reliable Churchill LLLP*,
   902 F.3d 132 (2d Cir. 2018)................................................................... 24, 25

*Entretelas Americanas S.A. v. Soler*,
   2020 WL 9815186 (S.D.N.Y. Feb. 3, 2020),
   *aff'd*, 840 F. App'x 601 (2d Cir. 2020) ................................................. 19, 20, 22, 23

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
   314 F.3d 48 (2d Cir. 2002)................................................................... 18

*Fioranelli v. CBS Broad. Inc.*,
   232 F. Supp. 3d 531 (S.D.N.Y. 2017)................................................................ 11

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004)................................................................... 25

*Flexborrow LLC v. TD Auto Fin. LLC*,
   255 F. Supp. 3d 406 (E.D.N.Y. 2017) ......................................................... passim

*GeigTech E. Bay LLC v. Lutron Elecs. Co.*,
   2019 WL 1768965 (S.D.N.Y. Apr. 4, 2019)........................................................ 18

*Gmurzynska v. Hutton*,
   355 F.3d 206 (2d Cir. 2004)................................................................... 18

*Goldfine v. Sichenzia*,
   118 F. Supp. 2d 329 (S.D.N.Y. 2000)................................................................ 25

*Gross v. Waywell*,
   628 F. Supp. 2d 475 (S.D.N.Y. 2009)................................................................ 19

*Hecht v. Com. Clearing House, Inc.*,
   897 F.2d 21 (2d Cir. 1990)................................................................... 25

*Hemi Grp., LLC v. City of New York, N.Y.*,
   559 U.S. 1 (2010)................................................................................. 23

*Hustlers, Inc. v. Thomasson*,
   2004 WL 3241667 (N.D. Ga. Dec. 29 ................................................................ 12

*James v. Gage*,
   2019 WL 1429520 (S.D.N.Y. Mar. 29, 2019) ................................................... 7, 8

*Koch v. Christie's Int'l PLC*,
   699 F.3d 141 (2d Cir. 2012)................................................................................ 5, 9

*Lexmark Intern., Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014).............................................................................................. 13

*Mackin v. Auberger*,
   59 F. Supp. 3d 528 (W.D.N.Y. 2014) ................................................................... 24

*Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*,
   624 F. App'x 23 (2d Cir. 2015) ............................................................................ 6

*Medisim Ltd. v. BestMed LLC*,
   910 F. Supp. 2d 591 (S.D.N.Y. 2012)................................................................... 14

*Moore v. PaineWebber, Inc.*,
   189 F.3d 165 (2d Cir. 1999).................................................................................. 22

*Morgan Art Found., Ltd. v. McKenzie*,
   2021 WL 863264 (S.D.N.Y. Jan. 22, 2021) ...................................................... 3, 9

*Ortho Pharm. Corp. v. Cosprophar, Inc.*,
   32 F.3d 690 (2d Cir. 1994).................................................................................... 15

*Parks v. ABC, Inc.*,
   341 F. App'x 737 (2d Cir. 2009) .......................................................................... 10

*Powers v. Brit. Vita, P.L.C.*,
   57 F.3d 176 (2d Cir. 1995).................................................................................... 20

*Rajaratnam v. Motley Rice, LLC*,
   449 F. Supp. 3d 45 (E.D.N.Y. 2020) .................................................................... 19

*RBC Nice Bearings, Inc. v. Peer Bearing Co.*,
   410 F. App'x 362 (2d Cir. 2010) ..................................................................... 10, 11

*Restellini v. Wildenstein Plattner Institute, Inc.*,
   2021 WL 4340824 (S.D.N.Y. Sept. 22, 2021)................................................. 12, 17

*Rexall Sundown, Inc. v. Perrigo Co.*,
   651 F. Supp. 2d 9 (E.D.N.Y. 2009) ................................................................. 10, 11

*Sandler v. Simoes*,
   609 F. Supp. 2d 293 (E.D.N.Y. 2009) ................................................................... 9

*Scarola Malone & Zubatov LLP v. Verizon Commc'ns, Inc.*,
   2015 WL 3884211 (S.D.N.Y. June 24, 2015),
   *aff'd sub nom. Scarola Malone & Zubatov LLP v. McCarthy, Burgess & Wolff*,
   638 F. App'x 100 (2d Cir. 2016) ......................................................................... 7

*Silverstein v. Penguin Putnam, Inc.*,
   522 F. Supp. 2d 579 (S.D.N.Y. 2007)................................................................. 12

*Town of Islip v. Datre*,
   245 F. Supp. 3d 397 (E.D.N.Y. 2017) ............................................................... 20

Statutes

15 U.S.C. § 1125(a)(1)(A) ......................................................................................... 5

15 U.S.C. § 1125(a)(1)(B) ................................................................................... 5, 17

17 U.S.C. § 102 ....................................................................................................... 16

18 U.S.C. § 1956(c)(7) ............................................................................................ 21

18 U.S.C. § 1957.................................................................................................. 21, 22

18 U.S.C. § 1962(c) ............................................................................................. 5, 25

18 U.S.C. § 1962(d) ............................................................................................. 5, 25

Rules

Fed. R. Civ. Proc. 9(b) ...................................................................................... passim

Other Authorities

Melville B. Nimmer & David Nimmer, 2 Nimmer on Copyright § 7.03 ....................... 5

Defendants Artists Rights Society, Inc. ("ARS") and Janet Hicks (collectively, the "ARS Defendants") respectfully move to dismiss Plaintiff's Amended Complaint ("AC," ECF No. 25).

The core allegation in this putative Lanham Act and RICO case is that when ARS offered members of the public licenses to use the famous 1964 "LOVE" image created by renowned artist Robert Indiana, it misrepresented LOVE as copyright protected when it is really in the public domain. Plaintiff, who purports to own the right to market and license uses of Indiana's later and less popular work "HOPE," alleges that he has lost "many millions of dollars" in licensing because HOPE cannot fairly compete in the open market with LOVE when only the latter is claimed to be copyright protected.[1] Whether a work has fallen into the public domain is a potentially complex legal issue; the ARS Defendants believe and will prove if necessary that LOVE is not in the public domain and that ARS has never misrepresented its copyright status. But that issue does not need to be decided now because Plaintiff's claims are untimely, not cognizable under the Lanham Act or RICO, and facially implausible, and should be dismissed with prejudice.

*First*, Plaintiff's claims are untimely under RICO's four-year limitations period and the applicable six-year period that creates a presumption of laches for Lanham Act claims. Plaintiff alleges that ARS has been fraudulently marketing LOVE as copyrighted for "at least two decades" and that he has been injured from competing with LOVE in the art market since at least 2008. He filed this lawsuit roughly a decade too late in 2022.

*Second*, claims such as Plaintiff's asserting misrepresentations regarding copyrights are not redressable under the Lanham Act, as the Supreme Court made clear in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003). Plaintiff also does not plausibly allege causation, since he assumes that would-be licensees would have instead bought licenses to HOPE

---

[1] Renderings of LOVE and HOPE can be found on pages 7, 13, and 16 of the AC.

if they had known that LOVE was really in the public domain as alleged. This is inherently speculative and implausible, including because if Plaintiff's theory that LOVE is free for everyone to exploit were correct, free market actors who wanted to use LOVE would have simply done so for free rather than purchase a license from Plaintiff to use a different image.

*Third*, Plaintiff falls far short of the stringent requirements for stating a civil RICO claim. Plaintiff's RICO allegations sound in fraud and must satisfy Rule 9(b), yet he points to nothing plausibly suggesting—let alone pleading with particularity—that the ARS Defendants were aware of any fraud. And like with his Lanham Act claims, Plaintiff fails to plead proximate causation, instead alleging the precise sort of "intricate, uncertain" second-hand injury "by [an] economic competitor[]" that the Supreme Court has resoundingly rejected for civil RICO purposes. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460 (2006).[2]

## BACKGROUND

Plaintiff Michael McKenzie (d/b/a "American Image") alleges that he is "a prolific art publisher" who, in 2007, co-designed HOPE with Indiana and worked with Indiana to produce and market it. (AC ¶¶ 1, 9, 50-52.) ARS is "the most prominent licensing entity for art" (*id.* ¶ 92) and represents approximately 120,000 artists and artists' estates worldwide, including Salvador Dali, Pablo Picasso, Henri Matisse, Andy Warhol, and Jackson Pollock. Janet Hicks is ARS's vice president and director of licensing. (*See id.* ¶¶ 11, 63.) Plaintiff alleges that the ARS Defendants participated in a putative RICO scheme to defraud the public as to the copyright status of LOVE with the following entities/individuals who are now co-Defendants (collectively, the "Morgan Defendants"): (1) Morgan Art Foundation Ltd. ("Morgan"), which acquired Indiana's copyright in LOVE from him in a 1998 contract (the "Indiana Agreement," attached as Ex. A to 1/23/23

---

[2] Citations are omitted from, and emphasis added to, all legal citations herein unless otherwise indicated.

Sholder Decl.)[3]; (2) Philippe Grossglauser, "the director of Morgan"; and (3) Simon Salama-Caro, allegedly Morgan's agent in New York. (*See, e.g., id.* ¶¶ 12-14.)[4] In a separate lawsuit to which the ARS Defendants are not parties, Morgan alleges that Plaintiff, *inter alia*, forged Indiana works and hid a cache of Indiana works from opposing lawyers during a discovery inspection.[5]

Plaintiff alleges here that Indiana never copyrighted LOVE, and instead dedicated it to the public domain by repeatedly publishing it "over many years without any notice of copyright." (*Id.* ¶¶ 19-22.) But Indiana himself did not believe that, since in the Indiana Agreement he expressly "transfer[ed] and assign[ed]" to Morgan "all of my trademarks, copyrights, and other rights" in LOVE and other of his images. (Indiana Agreement at 1; *see also* AC ¶ 24 (discussing and quoting from this and a related 1999 Indiana-Morgan contract).) Morgan then entered into a 1999 agreement with ARS (the "ARS Agreement," attached as Ex. A to AC) for the purpose of licensing LOVE and other Indiana works, which remains in effect. (AC ¶¶ 32-33.) In the ARS Agreement, Morgan "represents and warrants that it is the sole and exclusive owner of the worldwide rights to reproduce, promote, license, and sell images of" Indiana works including LOVE, pursuant to the Indiana Agreement. (ARS Agreement ¶ 1.) ARS is authorized "to act as a non-exclusive representative worldwide with regard to licensing third parties for reproductions of the Works of

---

[3] Plaintiff attached several contracts as exhibits to his AC, but not the Indiana Agreement. The Court nevertheless may consider the Indiana Agreement because the AC "relies heavily upon its terms and effect" and Plaintiff has "notice that the material may be considered." *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-54 (2d Cir. 2002). Among other ways, this is shown by the fact that Plaintiff quotes from the Indiana Agreement, describes it in detail, and argues that it did not effectively transfer LOVE's copyright. (*See, e.g.*, AC ¶¶ 23-25.) The version of the Indiana Agreement attached as Ex. A to the Sholder Declaration is the only copy the ARS Defendants possess and contains several handwritten redactions in provisions not relied on for this motion or in the AC.

[4] The Morgan Defendants were not originally named as defendants in this case but were added with the AC. They are represented by different counsel and do not join this motion.

[5] This litigation is *Morgan Art Foundation, Ltd. v. McKenzie* ("*Morgan*"), No. 18-CV-4438(AT)(BCM) (S.D.N.Y. filed May 18, 2018). As explained below, Plaintiff was denied leave to amend his Answer in *Morgan* to add certain affirmative defenses and counterclaims that are based on his central allegation that LOVE has been in the public domain. *Morgan Art Found., Ltd. v. McKenzie*, 2021 WL 863264, at *7 (S.D.N.Y. Jan. 22, 2021). (*See also* ECF No. 3 at 2 (Plaintiff discussing this in related case statement filed in instant case).)

Robert Indiana." (*Id.* ¶ 2.) Among other things, ARS is required to "include as a condition of each license a requirement that the following copyright notice accompany the licensed reproduction: © [year of publication] Morgan Art Foundation, Ltd./Artists Rights Society (ARS), New York." (*Id.* ¶ 8; *see generally* AC ¶¶ 32-40.)

According to Plaintiff, all of this is fraudulent because LOVE was really in the public domain such that "Indiana never had such a copyright to convey" to Morgan, and everybody, including "all Defendants," "well knew" this. (*E.g.*, *id.* ¶¶ 23, 25, 34, 39.) Plaintiff alleges that the ARS Agreement accordingly constituted "an agreement between the Defendants to commit fraud on any and all members of the public who became licensees, and on any and all members of the public who thereafter purchased any of the products" containing the allegedly false copyright notice, which itself was "the heart of the fraudulent scheme." (*Id.* ¶¶ 37-38; *see also id.* ¶¶ 33-35, 41-43 (alleged fraud "was, and remains, ongoing"; fraudulent sales are "extensive and ongoing").)

Plaintiff alleges that he has suffered "at least many millions of dollars in lost license revenues" for HOPE because he "was competing honestly" in not claiming copyright protection for HOPE while Defendants "cheated" in doing so for LOVE. (*Id.* ¶¶ 61, 70.) Although he points to no survey data, customer testimonials, or other evidence of what purchasers in the market believed, he alleges that potential licensees regarded LOVE as more valuable than HOPE due to the former's copyright notice because they believed they were acquiring a right to use the image that non-licensees did not possess. (*See, e.g.*, *id.* ¶¶ 31, 42-43.) Plaintiff goes so far as to allege that end consumers (e.g., those who purchased t-shirts or trinkets featuring LOVE) believed the image was copyrighted and are fraud victims. (*Id.* ¶¶ 38, 44.) In short, Plaintiff claims injury as a competitor in the art market because representing LOVE as copyrighted purportedly "has greatly and unfairly enhanced the LOVE image at the expense of the HOPE image." (*Id.* ¶¶ 87-96.)

Plaintiff asserts causes of action for false designation of origin and false advertising under the Lanham Act (15 U.S.C. §§ 1125(a)(1)(A) and (B)) and for racketeering and conspiracy under RICO (18 U.S.C. §§ 1962(c) and (d)). (*Id.* ¶¶ 62-71, 72-115.) He seeks compensatory damages, "treble damages as allowed by law," attorney's fees, and an injunction. (*Id.* at 36-37.)

## ARGUMENT

A Rule 12(b)(6) motion to dismiss should be granted if the plaintiff fails to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[L]egal conclusions" need not be accepted as true and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. As set forth below, Plaintiff fails to satisfy this standard, and this case should be dismissed with prejudice.[6]

## I.    PLAINTIFF'S CLAIMS ARE ALL TIME-BARRED.

### A.    RICO's Four-Year Statute Of Limitations Bars Plaintiff's Claims.

Civil RICO claims have a four-year statute of limitations. *E.g.*, *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148 (2d Cir. 2012). The statute of limitations begins to accrue from when the plaintiff "discovered or should have discovered the injury," or in other words, had "actual or inquiry notice of the injury." *Id.* at 150-51, 153 (RICO statute begins to run "once there are

---

[6] The ARS Defendants do not concede that the claim that LOVE is copyright protected is false to begin with and note that the Court need not take that allegation as true at the pleading stage because whether a work is in the public domain is a legal conclusion. *See, e.g.*, *Iqbal*, 556 U.S. at 678. The ARS Defendants will prove if necessary that Indiana's LOVE image did not fall into the public domain because Indiana did not intend for LOVE to fall into the public domain and the publications that purportedly caused such were made without Indiana's authority and against his interests. *See* Melville B. Nimmer & David Nimmer, 2 Nimmer on Copyright § 7.03 ("[P]ublications without notice occurring prior to 1978 will not serve to inject such works into the public domain if made in violation of a condition imposed by the copyright owner requiring the affixation of notice, even if such conduction was oral or implied."). Indeed, this is shown by the fact that Indiana himself sought to convey that copyright to Morgan in the Indiana Agreement. (*See* Indiana Agreement at 1; AC ¶ 24.) But this case should be dismissed now for numerous reasons apart from that issue, as detailed herein.

sufficient 'storm warnings' to trigger the duty to inquire"; "knowledge of facts that would suggest to a reasonably intelligent person the probability that the person has been injured is dispositive"); *see also, e.g.*, *Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F. App'x 23, 26 (2d Cir. 2015) (RICO claims untimely where plaintiff "repeatedly learned information that conflicted with its purported understanding" of defendants' business operations yet "never seriously investigated"). Here, Plaintiff filed suit on February 27, 2022; his claims are thus untimely if he should have discovered his alleged RICO injury before February 27, 2018.

There is no question that Plaintiff was at least on inquiry notice of his alleged RICO injury before February 2018. LOVE was created almost six decades ago in 1964 and, according to Plaintiff, has allegedly been repeatedly published "over many years without any notice of copyright" since then. (AC ¶¶ 19-21.) At the same time, Plaintiff alleges Defendants have widely misrepresented LOVE as copyright protected "for at least two decades," meaning since at least February 2002, and according to other allegations, since 1999. (*Id.* ¶¶ 3-5 ("years-long false claims"); *see also id.* ¶¶ 32-41 (alleged fraud "was, and remains, ongoing" since 1999 ARS Agreement and is "extensive").) Indeed, the exemplar boilerplate copyright notice depicted in the AC is dated 2011, showing that such products have been in circulation for at least 12 years. (*Id.* ¶ 40.) Meanwhile, Plaintiff alleges that he co-created HOPE in 2007 and began marketing it in direct competition with LOVE since at least 2008. (*See id.* ¶¶ 50-56.) In sum, Plaintiff's alleged injury began in 2008 and he needed to file his RICO claims by 2012. He missed that deadline by a decade.

Plaintiff nevertheless alleges (for the first time in his AC) that he "did not learn of [the alleged] falsification of the copyright until early 2020," when Hicks testified at a deposition in *Morgan* about the ARS Agreement, purportedly prompting Plaintiff to investigate LOVE's copyright status. (*Id.* ¶¶ 56, 102.) Plaintiff alleges that until then, he had "seen the public

advertising … referr[ing] to the LOVE image as being copyrighted to Morgan," and, like "the artworld generally," believed "that LOVE was copyrighted to Morgan." (*Id.* ¶ 103.) These tolling allegations are not credible and should be disregarded, for several reasons.

***First***, Plaintiff's new tolling allegations directly contradict facts previously alleged in his Complaint, which were that Indiana's wide and repeated publications of LOVE without a copyright notice since the 1960s made it "obvious to ***anyone involved in the art world***" that "LOVE is and has been for many decades in the public domain." (Compl. (ECF No. 1) ¶ 26.) Although amended pleadings typically supersede prior ones, courts find that "where allegations in an amended pleading 'directly contradict' pleadings in the original complaint, [they may] disregard the amended pleading." *See, e.g.*, *James v. Gage*, 2019 WL 1429520, at *6 (S.D.N.Y. Mar. 29, 2019). This result is particularly appropriate when "a plaintiff blatantly changes his statement of the facts in order to respond to the defendant's motion to dismiss and directly contradicts the facts set forth in his original complaint." *Id.* at *7; *see also, e.g.*, *Scarola Malone & Zubatov LLP v. Verizon Commc'ns, Inc.*, 2015 WL 3884211, at *6 (S.D.N.Y. June 24, 2015), *aff'd sub nom. Scarola Malone & Zubatov LLP v. McCarthy, Burgess & Wolff*, 638 F. App'x 100 (2d Cir. 2016) ("disregarding the contradictory allegations" in amended pleading that had been engineered to attempt to avoid dismissal ground that had been "argued in a pre-motion letter").

That is exactly what happened here. As just shown, Plaintiff alleged in his original Complaint that "anyone involved in the art world" has known since the 1960s that LOVE is supposedly public domain. (Compl. ¶ 26.) Now, and notably ***after*** the ARS Defendants filed a pre-motion letter stating a statute of limitations defense (ECF No. 20), Plaintiff contradicts himself by alleging he and the art community in general did ***not*** know LOVE was in the public domain and believed Morgan held its copyright until Hicks' 2020 testimony prompted him to investigate. (*See*

¶ 56, 102-03.) Plaintiff "blatantly change[d] his statement of the facts" to attempt to defeat a statute of limitations defense and the Court should ignore the new allegations and find Plaintiff's claims untimely based on his original allegations. *See, e.g.*, *James*, 2019 WL 1429520, at \*7.

   ***Second***, there is more than enough in the AC to find Plaintiff's tolling allegations implausible even without relying on the now-contradicted allegations in Plaintiff's original Complaint. After all, Plaintiff alleges that (1) LOVE was dedicated to the public domain through Indiana's prominent notice-free publications of it "repeatedly for decades," including "on statues publicly displayed, and in many other forms of artwork" (AC ¶¶ 18-22); yet (2) Defendants since 1999 have supposedly brazenly, ubiquitously, and repeatedly misrepresented LOVE as copyrighted both to the general public and within the art community—including "extensive and ongoing" fraudulent sales to "all manner of manufacturers, vendors, and retailers," causing "the affixation of a false copyright notice on thousands of products" "over hundreds of thousands of times" (*e.g.*, *id.* ¶¶ 3-5, 8, 41-43, 68, 75-76). Taking these allegations as true, any reasonably diligent plaintiff would have been on inquiry notice since at least the early 2000s.

   This is particularly so given that Plaintiff is no ordinary member of the public, but rather a "prolific art publisher" (*id.* ¶ 1) who claims to have personally undertaken to revive the popularity of LOVE through "a massive media and art campaign" in the 1990s after it had allegedly fallen out of favor with the public (*id.* ¶¶ 8, 45-48). This campaign, which allegedly "included books, prints, products, television, magazines, exhibitions, and licensing" (*id.* ¶ 45), presumably would have ***necessitated*** an inquiry into LOVE's copyright status. Similarly, Plaintiff alleges that he (1) personally worked closely with Indiana on this and the creation/marketing of HOPE (*id.* ¶¶ 49-54, 57-59); (2) has been in direct competition with LOVE since 2008 (*id.* ¶¶ 55, 60-61); and (3) lost "many millions of dollars" in licensing due to Defendants' purported fraud and "cheating" (*id.* ¶¶

4, 61, 70). Given all this, it is implausible for Plaintiff to now allege that he was unaware of a need to investigate LOVE's copyright status before Hicks' deposition in 2020. If the ARS Defendants—who are not alleged to have had *any* direct relationship with Indiana or prior role in marketing LOVE—"well knew" that LOVE was really in the public domain when entering the ARS Agreement in 1999 (*id.* ¶¶ 34, 39, 74-75), then surely Plaintiff—who alleges that he *personally worked with* Indiana and *personally conducted* a large marketing campaign to allegedly revive the popularity of LOVE—"well knew" this too, and has "well known" it for decades. And in any event, the standard is not when a plaintiff in fact learned of the alleged injury, but when a "reasonably intelligent person" would have been aware of "storm warnings" and a need to investigate. *See, e.g.*, *Koch*, 699 F.3d at 150-51, 153. That standard is easily met here.

*Third,* Plaintiff is collaterally estopped from arguing otherwise. In *Morgan* (where Plaintiff is the defendant and counterclaimant against Morgan and others), Plaintiff sought leave to amend his Answer to add counterclaims based on the allegation that LOVE is in the public domain. On January 22, 2021, the *Morgan* court denied Plaintiff's motion, finding that these allegations were "based on information that was 'previously available to the public,' … in most cases for decades before this lawsuit was filed," such that Plaintiff's failure to assert them earlier was "due to his own lack of diligence." *Morgan*, 2021 WL 863264, at *7. (*See also* ECF No. 3 (Plaintiff acknowledging this in related case statement).) Plaintiff, who is represented by the same counsel in *Morgan*, "had an opportunity to fully and fairly litigate" the timeliness of his public domain-based claims there and the ARS Defendants here may "defensively invoke collateral estoppel regarding [these] issues" that were decided against Plaintiff in *Morgan*. *See, e.g.*, *Sandler v. Simoes*, 609 F. Supp. 2d 293, 299 (E.D.N.Y. 2009). At a minimum, even if they do not give rise

to estoppel, the *Morgan* court's findings further demonstrate the extent to which Plaintiff's claims here were discoverable much earlier and are untimely in light of his "own lack of diligence."

      **B.**     **<ins>Plaintiff's Lanham Act Claims Are Barred By Laches.</ins>**

Laches presumptively applies to bar Lanham Act claims once the analogous state-law limitations period has run, which here is New York's six-year limitations period for fraud. *See, e.g.*, *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191-92 (2d Cir.1996); *Parks v. ABC, Inc.*, 341 F. App'x 737, 739 (2d Cir. 2009) ("Where the complaint is filed outside the six-year limitations period, the plaintiff bears the burden to prove the circumstances making it inequitable to apply the laches defense."). Plaintiff, who allegedly has been competing with LOVE since 2008 but did not file suit until February 2022, therefore bears the burden of establishing that (1) his delay in filing suit was excusable; and (2) that the ARS Defendants were not prejudiced by this. *See, e.g.*, *RBC Nice Bearings, Inc. v. Peer Bearing Co.*, 410 F. App'x 362, 364 (2d Cir. 2010).

Plaintiff cannot possibly make this showing. For all the reasons explained above, Plaintiff's delay was inexcusable; he could have learned of the supposed false advertising or unfair competition decades ago given his alleged position in the art community, purported connection to Indiana and LOVE, and the alleged ubiquity of the purportedly false representations over which he has brought suit. *See, e.g.*, *id.* at 365 (affirming laches dismissal where "[t]he only reasonable inference that can be drawn from the record is that Nice should have known of Peer's allegedly infringing conduct—which began no later than 1961—well before September 5, 2003"); *Parks*, 341 F. App'x at 739 (affirming dismissal where plaintiff "knew that the songs she co-wrote were being [mis]attributed … as of 1969"); *Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 31-32 (E.D.N.Y. 2009) (delay inexcusable where party "monitored [product] in the market and, therefore, surely was aware or should have been aware of" claim at issue, which "was publicly available"). And ARS, which has been licensing LOVE based on its agreement with Morgan since

*1999*, certainly has been prejudiced by Plaintiff's failure to object to its practices until February 2022. *See id.* at 32-33 (finding prejudice where party "made substantial investments of money and resources" in challenged marketing). Plaintiff's failure to file this lawsuit until 2022 also prevents the parties from obtaining important evidence from Indiana himself, who died in 2018, causing further prejudice. *See RBC*, 410 F. App'x at 365-66 (finding prejudice for similar reason).

## II.   PLAINTIFF HAS FAILED TO STATE A CLAIM UNDER THE LANHAM ACT.

Plaintiff's Lanham Act claims should be dismissed because the Lanham Act does not apply to alleged misrepresentations about copyrights. Plaintiff also does not plausibly allege causation or that a misrepresentation was made in advertising or promotion.

### A.   Plaintiff's Claims Alleging Misrepresentations About Copyright Status Are Not Redressable Under The Lanham Act.

Plaintiff's Lanham Act claims all fail as a matter of law because purported misrepresentations about copyrights are not redressable under the Lanham Act. In *Dastar*, the Supreme Court considered whether Dastar could be liable under the Lanham Act for repackaging certain public domain video content and marketing it as its own. 539 U.S. at 26-27. The Court first explained that the Act's provision allowing actions for false designation of origin and false advertising "does not have boundless application" and "can apply only to certain unfair trade practices prohibited by its text." *Id.* at 29. It held that "the 'origin' of 'goods'" refers to "the producer of the tangible product sold in the marketplace" and is "incapable of connoting the person or entity that originated the ideas or communications that 'goods' embody or contain." *Id.* at 31-32. In other words, "origin of goods" "refers to the producer of the tangible goods that are offered for sale, *and not to the author of any idea, concept, or communication embodied in those goods*." *Id.* at 37; *see also, e.g.*, *Fioranelli v. CBS Broad. Inc.*, 232 F. Supp. 3d 531, 540-41 (S.D.N.Y. 2017) (applying *Dastar* and holding that under the Lanham Act, "the 'origin of goods' means the

manufacturer of the goods, the publisher of a book or the producer of the television program" and not "[t]he author of ideas that are reproduced in tangible products or goods"); *Silverstein v. Penguin Putnam, Inc.*, 522 F. Supp. 2d 579, 601 (S.D.N.Y. 2007) ("[T]he author of ideas that are reproduced in tangible products such as films and books is not the "origin of goods" within the meaning of the Lanham Act.").

Courts applying *Dastar* in similar circumstances have held that purportedly misrepresenting copyright ownership does not qualify as misrepresenting "the origin" of goods or services under the Lanham Act. For example, in *Restellini v. Wildenstein Plattner Institute, Inc.*, the defendant-counterclaimant argued that opposing parties had "misrepresent[ed] [certain artworks] as copyrightable" and "misrepresent[ed] [themselves] as *exclusive* possessors of" the works "in order to force individuals to pay them for access." 2021 WL 4340824, at *8 (S.D.N.Y. Sept. 22, 2021). The court held that these copyright-based theories were not actionable under the Lanham Act and *Dastar*, since they "center[] around the ownership and authorship of the ideas in the [works], not any statements about the physical product which contains those ideas." *Id.* The court explained that a representation about one's right to exploit works, including "whether the information is in the public domain," is "a distinction sounding in copyright," and "under *Dastar*, such a statement is not actionable under the Lanham Act." *Id.*; *see also, e.g.*, *Hustlers, Inc. v. Thomasson*, 2004 WL 3241667, at *3 (N.D. Ga. Dec. 29, 2004) (rejecting claim "based solely on the allegation that the ownership of the copyrights to certain musical compositions was incorrectly attributed" because "the alleged misrepresentations concern the copyrights, intangible property interests, and not any tangible product" and "[a] copyright is not a 'good,' as defined in *Dastar*") (citing *digiGAN, Inc. v. iValidate, Inc.*, 2004 WL 203010, *5 (S.D.N.Y. Feb. 3, 2004) for proposition that IP "is not a 'good or service' for purposes of Lanham Act"); *Crocs, Inc. v.*

*Effervescent, Inc.*, 2021 WL 4170997, at *1, *4 (D. Colo. Sept. 14, 2021) (granting summary judgment on Lanham Act claim alleging Crocs misrepresented sandals material "as 'patented,' 'proprietary,' and 'exclusive'"; these descriptors concerned authorship and "*Dastar* holds that the Lanham Act does not provide a cause of action for claims concerning authorship").

Here, Plaintiff's false designation of origin claims fail as a matter of law because the alleged misrepresentation concerns only intellectual rights (i.e., LOVE's copyright status and who owns it), and this is not actionable under the Lanham Act. *See, e.g.*, *Dastar*, 539 U.S. at 37; *Restellini*, 2021 WL 4340824, at *8. The same is true of Plaintiff's false advertising claims. *See, e.g.*, *id.* ("Courts in this circuit are 'in agreement' that this concept extends to claims brought under § 43(a)(1)(B), holding that 'the words "nature, characteristics, and qualities" in 43(a)(1)(B) cannot be read to refer to authorship'"); *Agence France Presse v. Morel*, 769 F. Supp. 2d 295, 308 (S.D.N.Y. 2011) (rejecting Lanham Act false advertising claim with allegations "identical to those supporting [plaintiff's] false representation claim," since "[t]he import of *Dastar* that an author's recourse for unauthorized use is in copyright cannot be avoided by shoe-horning a claim into section 43(a)(1)(B) rather than 43(a)(1)(A)").

## B.   Plaintiff Fails To Plausibly Allege Proximate Causation Or Materiality.

Plaintiff's Lanham Act claims should also be dismissed because Plaintiff does not plausibly allege that the purported misrepresentation regarding copyright status proximately caused him any injury or that it was material to consumer purchasing decisions. *See Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132-33 & n.6 (2014) ("If a plaintiff's allegations, taken as true, are insufficient to establish proximate causation, then the complaint must be dismissed …."). "The proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct" and is satisfied only when the injury "flow[s] directly from the deception wrought by the defendant's advertising." *Id.* at 133. When an "advertisement

does not refer to a competing product or make a comparative claim, 'some indication of actual injury and causation' would be necessary in order to ensure that a plaintiff's injury is not speculative." *Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 377 F. Supp. 3d 337, 347 (S.D.N.Y. 2019), *on reconsideration*, 394 F. Supp. 3d 368 (S.D.N.Y. 2019); *Medisim Ltd. v. BestMed LLC*, 910 F. Supp. 2d 591, 617-18 (S.D.N.Y. 2012) (plaintiff alleging non-comparative false advertising under Lanham Act failed to provide evidence of "actual injury and causation").

Here, Plaintiff alleges that he has been injured because both would-be licensees and end consumers chose LOVE over HOPE because they incorrectly believed the former was copyright protected. (AC ¶¶ 42-44, 70, 87-96.) These allegations are inherently speculative and implausible. This is especially so because Plaintiff must provide "some indication of actual injury and causation" given that he does not allege that Defendants' statements referred to his own competing product, *see, e.g.*, *Dependable Sales*, 377 F. Supp. 3d at 347, yet has not done so.

***First***, Plaintiff fails to plausibly allege that the purported misrepresentation regarding LOVE's copyright status caused him injury through lost licensing opportunities. Plaintiff alleges that would-be licensees were deceived into purchasing licenses from ARS to exploit LOVE, when in fact LOVE has been in the public domain and no license was needed to use it. (*E.g.*, AC ¶¶ 42-43, 87-96.) But it is implausible for Plaintiff to contend that these entities would have ***instead chosen to purchase licenses from Plaintiff for HOPE*** had they known that LOVE was really in the public domain, as he must to prevail on his injury theory. Rather, these entities, acting rationally in the free market, would have simply chosen to use LOVE for free without a license, since under Plaintiff's own theory, that image has purportedly always been free for everyone in the world to exploit. In other words, Plaintiff's central causation theory assumes that free market actors faced with a choice of (1) using the image they wanted (LOVE) for free or (2) paying Plaintiff a licensing

fee to use a different image that was not their first choice (HOPE) would have acted against their economic self-interest (and tastes) and chosen the second option. This claim is inherently irrational and implausible, and it should be dismissed. *See Iqbal*, 556 U.S. at 678.

This is especially true because LOVE and HOPE are just two of countless artworks available for licensing on the open market, including from Indiana's large oeuvre (which notably includes other similarly stylized block-letter images, like "AHAVA, AMOR, NUMBERS, and YALE"). (*See* AC ¶ 24.) Although Plaintiff alleges that LOVE and HOPE "have no competition other than each other" (AC ¶¶ 60-61, 91), it is actually pure speculation to presume that would-be licensees, if they did not simply opt to use LOVE for free, would have specifically chosen to license HOPE over countless potential alternatives. People choose art for reasons that are inherently personal, aesthetic, and emotional, and it is impossible to predict which artworks would-be licensees would have instead selected for their endeavors if they rejected LOVE as Plaintiff predicts they would have. *See, e.g.*, *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 697 (2d Cir. 1994) (observing that "consumer behavior is unpredictable" and declining to infer causation or injury where advertisements were not comparative).[7] Plaintiff's causation theory therefore "depends on multiple levels of speculation" and is "too attenuated to demonstrate a real 'likelihood of injury and causation.'" *Conte v. Newsday, Inc.*, 2013 WL 978711, at *13 (E.D.N.Y. Mar. 13, 2013) (rejecting Lanham Act causation theory of competitive injury for this reason); *Avalos v.*

---

[7] This is in part due to LOVE's immense and longstanding popularity. Plaintiff previously acknowledged this fact, alleging in his Complaint that LOVE "was always a popular image" and is Indiana's "most famous" work. (Compl. ¶¶ 21-22.) He now strategically retreats from those claims, instead alleging that LOVE was "Indiana's then most famous art image" (as of 1999) but had become "a washed up 1960's nostalgia work" before Plaintiff personally "brought [it] back to popularity in the 1990s" through a major media campaign (AC ¶¶ 34, 45-48). Plaintiff nevertheless continues to acknowledge LOVE's immense popularity, describing how the image "went viral" after its creation and "became one of the most recognizable sculptures in the world," with, *inter alia*, the US Postal Service printing hundreds of millions of stamps featuring it. (*Id.* ¶ 20 (quoting court statement by Morgan).) In this vein, it is inherently contradictory for Plaintiff to argue that copyright status is what made LOVE so popular but at the same time contend that he personally made the image popular again through his media campaign.

*IAC/Interactivecorp.*, 2014 WL 5493242, at *5 (S.D.N.Y. Oct. 30, 2014) (dismissing Lanham Act claims that "fail[ed] to allege a plausible causal connection between that harm and Defendants' actions" where claims depended on multiple consumer behavior variables).[8]

Plaintiff's allegations also implausibly and incorrectly assert that he was disadvantaged because he could not level the playing field by claiming that HOPE is copyrighted and requiring a similar copyright notice for it. Plaintiff alleges that he co-created HOPE in 2007 but that "[b]ecause [HOPE] was not copyrighted," he "did not claim that it was copyrighted," and could not have marketed it as copyrighted "honestly." (AC ¶¶ 55, 59, 61.) This is legally incorrect; all works created after January 1, 1978, automatically are copyright protected upon fixation; no notice, publication, or other formalities are required to secure authorship and ownership. *See* 17 U.S.C. § 102. Similarly, it is legally incorrect for Plaintiff to allege that the LOVE image (or HOPE) cannot be copyright protected because "the law will not allow for the copyrighting of a word." (AC ¶ 4.) The copyright protection at issue is not over the word "love" (or "hope") itself, but rather Indiana's stylized, artistic depiction of words—in the case of LOVE, in a box shape with italicized *L*, as depicted throughout the AC. In sum, Plaintiff **could** have legally and "honestly" marketed the similarly stylized HOPE as copyrighted and therefore erased LOVE's supposed unfair advantage. His own decision not to do that—whether due to a fundamental misunderstanding of copyright law or for some other reason—breaks the chain of causation under his own theory of liability.

**Second**, it is even more speculative for Plaintiff to allege, as he does, that consumers purchasing licensed merchandise featuring LOVE and the embossed boilerplate copyright notice would have instead purchased merchandise featuring HOPE absent that notice. (*See* AC ¶¶ 38,

---

[8] It is even more speculative for Plaintiff to allege that the purported copyright misrepresentation led "major art licensing entities (including ARS itself) to not work with Plaintiff. (*See* AC ¶ 95.) Just as consumers purchase art for many different reasons including their tastes, businesses reject or accept potential counterparties for financial, practical, and other purely business reasons that have nothing to do with copyright notices.

44.) In other words, Plaintiff has failed to plead injury from consumer choices because he has failed to identify a material misrepresentation. *See, e.g.*, *Restellini*, 2021 WL 4340824, at *7 (for Lanham Act claims, "[t]hat falsity must also be material: it must go to the nature, characteristics, or qualities of the product, and it must affect a consumer's buying decisions").

"Statements about whether a defendant has the right to use or distribute a work ***are not considered material in this district***." *Id.* Rather, consumers purchase merchandise featuring artwork for substantive reasons that have nothing to do with copyright notices, including because they like the way the art looks, have an emotional connection to the work or the artist, or are collectors of a certain genre of art. It is implausible if not ridiculous for Plaintiff to allege that any consumers purchased, for example, t-shirts featuring LOVE because they saw a copyright notice, and that they would have purchased t-shirts featuring HOPE instead if the LOVE notice had been absent. As the Supreme Court put it, "[t]he consumer who buys a branded product does not automatically assume that the brand-name company is the same entity that came up with the idea for the product, or designed the product—and typically does not care whether it is." *Dastar*, 539 U.S at 32-33 (cautioning that the Lanham Act "should not be stretched to cover matters that are typically of no consequence to purchasers").

### C.   Plaintiff's False Advertising Claims Fail Because He Does Not Identify False Statements Made In Adverting Or Promotion.

In addition to the above grounds, Plaintiff's false advertising claim fails because he does not allege that Defendants misrepresented LOVE's copyright status "in commercial advertising or promotion," as required under the Lanham Act. 15 U.S.C. § 1125(a)(1)(B); *Conte*, 2013 WL 978711, at *14 ("Critical to this section is the fact that the misrepresentation must occur in 'commercial advertising or promotion' to be actionable."). To qualify as "'commercial advertising or promotion' under the Lanham Act, a statement must be: (1) 'commercial speech,' (2) made 'for

the purpose of influencing consumers to buy defendant's goods or services,' and (3) 'although representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public.'" *Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004). "[T]he touchstone" of this inquiry is that the statements were part of "an organized campaign to penetrate the relevant market." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002). "Proof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement." *Id.*

Here again, Plaintiff's allegations fall short. The AC identifies no actual advertisements or "organized campaign to penetrate the relevant market" with the allegedly false claims about LOVE's copyright status. *See Fendi USA, Inc.*, 314 F.3d at 57; *see also Gmurzynska*, 355 F.3d at 209-10 (affirming dismissal because statements by art experts challenging authenticity of plaintiff's art collection were "not commercial advertising or commercial promotion"). Nor does the AC sufficiently allege that the misrepresentation was made as part of commercial speech, which typically "possesses certain hallmarks, including pertinent price and product information." *GeigTech E. Bay LLC v. Lutron Elecs. Co.*, 2019 WL 1768965, at \*10-11 (S.D.N.Y. Apr. 4, 2019) (dismissing where allegedly misleading press release "otherwise lacked the usual trappings of commercial speech"). In fact, a boilerplate copyright notice on merchandise cannot be advertising or promotion since it is neither commercial speech nor "made 'for the purpose of influencing consumers to buy defendant's goods or services.'" *See Gmurzynska*, 355 F.3d at 210. Rather, its purpose is to alert the public of a claim of copyright and deter would-be infringers. *See Alcon Vision, LLC v. Lens.com, Inc.*, 2022 WL 1665453, at \*5 (E.D.N.Y. May 25, 2022).

## III.   PLAINTIFF FALLS FAR SHORT OF STATING A CIVIL RICO CLAIM.

"To state a RICO claim, a plaintiff must plead '(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity,'" as well as "injury to business or property as a result of the

RICO violation." *Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999). Civil

RICO is "an extreme cause of action"—"the litigation equivalent of a thermonuclear device"—

given the allure of treble damages to plaintiffs and the "almost inevitable stigmatizing effect" such

claims have on defendants. *E.g.*, *Entretelas Americanas S.A. v. Soler*, 2020 WL 9815186, at *4

(S.D.N.Y. Feb. 3, 2020), *aff'd*, 840 F. App'x 601 (2d Cir. 2020), *as amended* (Jan. 7, 2021);

*Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d 45, 64 (E.D.N.Y. 2020) (similar). Courts thus

"generally approach[] civil RICO claims with a skeptical eye" and find that they "almost always

miss the mark," especially when plaintiffs have "dress[ed] up run-of-the-mill fraud claims as RICO

violations." *Soler*, 2020 WL 9815186, at *4-5; *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 726 F.

Supp. 2d 225, 236 (E.D.N.Y. 2010) (warning that "plaintiffs have often been overzealous in

pursuing RICO claims, flooding federal courts by dressing up run-of-the-mill fraud claims as

RICO violations"); *see generally Gross v. Waywell*, 628 F. Supp. 2d 475, 479-80 (S.D.N.Y. 2009)

(summarizing statistical analysis showing a "minimal rate of success" for civil RICO claims).

Here, like countless others, Plaintiff has attempted and failed to construct a RICO case from

ordinary (and meritless) claims of fraud.[9]

### A.   <u>Plaintiff Has Not Adequately Pled Scienter.</u>

"When alleging fraudulent activities as predicate acts for a RICO claim, a plaintiff must

satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b)." *Flexborrow LLC

v. TD Auto Fin. LLC*, 255 F. Supp. 3d 406, 420 (E.D.N.Y. 2017). "Rule 9(b) has 'even greater

urgency' in civil RICO actions," such that "the 'overwhelming trend' among 'courts is to apply

---

[9] To be clear, the ARS Defendants have committed no fraud and could not be liable to Plaintiff for common law fraud because, *inter alia*, Plaintiff himself did not detrimentally rely on the alleged misrepresentations.

Rule 9(b) strictly in order to effect dismissal of civil RICO suits' alleging mail and wire fraud." *Soler*, 2020 WL 9815186, at *8.

Rule 9(b) requires a plaintiff alleging fraud to "provide some minimal factual basis for conclusory allegations of scienter that give rise to a strong inference of fraudulent intent." *Flexborrow*, 255 F. Supp. 3d at 421. This can be done "by either (1) 'alleging a motive for committing fraud and a clear opportunity for doing so' or (2) 'identifying circumstances indicating conscious behavior by the defendant.'" *Id.* For "motive and opportunity," mere "allegations that a defendant stands to gain economically from fraud do not satisfy the heightened pleading requirements of Rule 9(b)." *Id.* "Indeed, 'a generalized profit motive that could be imputed to any company has been consistently rejected as a basis for inferring fraudulent intent.'" *Id.* Conscious behavior must be demonstrated with "greater" circumstantial evidence, *e.g.*, *Town of Islip v. Datre*, 245 F. Supp. 3d 397, 414 (E.D.N.Y. 2017), so as to raise an "inference of fraudulent intent," *Powers v. Brit. Vita, P.L.C.*, 57 F.3d 176, 185 (2d Cir. 1995).

Plaintiff has failed to sufficiently plead the ARS Defendants' scienter under these principles. As to motive and opportunity, Plaintiff at most alleges that ARS stood to gain financially from licensing LOVE as copyrighted. (*See* AC ¶ 74 ("The Defendants engaged in a pattern of wrongful conduct … to gain money from their illegal and fraudulent scheme ….").) But as just explained, merely alleging a profit motive does not satisfy Rule 9(b). *Flexborrow*, 255 F. Supp. 3d at 421, 423. And although Plaintiff repeatedly accuses the ARS Defendants of acting "fraudulently" (*e.g.*, AC ¶¶ 75-81), there are no plausible, nonconclusory (let alone particularized) allegations that the ARS Defendants ***consciously knew*** this to be the case. He never alleges, for example, that these Defendants were advised by an attorney that LOVE was in the public domain but ignored such advice. Instead, Plaintiff repeatedly asserts only that all Defendants "well knew"

that LOVE was in the public domain, without more. (*See* AC ¶¶ 34, 39, 74-75.) These allegations are the definition of conclusory and do not satisfy any pleading standard, let alone Rule 9(b). *See, e.g.*, *Flexborrow*, 255 F. Supp. 3d at 423-24 ("supposition" that defendant "must have been privy" to alleged fraud scheme "does not, as a matter of law, support scienter for RICO purposes").

Plaintiff's failure to point to anything other than conclusory allegations suggesting the ARS Defendants' awareness of fraud is especially problematic given the complexity of the legal issue at the heart of the alleged fraud. Whether LOVE is in the public domain is a potentially complicated—and disputed—legal issue. As explained above, the ARS Defendants have always believed (and will demonstrate if necessary) that LOVE is not in the public domain because Indiana never published it with that intention. Given this fundamental dispute, it is implausible— and far less than Rule 9(b) requires—for Plaintiff to allege without more that the ARS Defendants "well knew" that it was false to represent LOVE as copyright protected. This is especially true because, as alleged, the ARS Defendants relied on Morgan's contractual representation that it owns the exclusive right to market and license LOVE pursuant to a direct agreement with Indiana. (AC ¶ 33; *see also* ARS Agreement ¶ 1 (Morgan "represents and warrants that it is the sole and exclusive owner of the worldwide rights" in Indiana works including LOVE); Indiana Agreement at 1 ("transfer[ring] and assign[ing]" to Morgan "all of my … copyrights … in … *LOVE*" and other works).) The ARS Defendants' reliance on Morgan's representation regarding LOVE's copyright undermines any inference that the ARS Defendants themselves knew of any falsity.

Finally, because Plaintiff fails to adequately plead the ARS Defendants' scienter, he fails to adequately plead any of the purported underlying RICO offenses asserted in the AC. This includes not only mail and wire fraud, but also money laundering (18 U.S.C. § 1956(c)(7)) and illegal monetary transactions (18 U.S.C. § 1957), both of which require the defendant to have had

knowledge of the illegality. *See, e.g.*, *Soler*, 2020 WL 9815186, at *9-10 (money laundering requires that defendant "knew that the monies he supposedly transferred … were the product of illegal activity"); *Crown Heights Jewish Comty. Council, Inc. v. Fischer*, 63 F. Supp. 2d 231, 253 (E.D.N.Y. 1999) (§ 1957 claim failed in a RICO action because plaintiff "utterly failed to make [the] required showing" of illegal activity which the claim depended on).

### B.    Plaintiff Fails To Plead Instances Of Mail Or Wire Fraud With Particularity.

Under Rule 9(b), Plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anatian*, 193 F.3d at 88. "'[S]weeping and general allegations of mail and wire fraud' [are] insufficient to meet Rule 9(b)'s heightened pleading standard." *See, e.g.*, *Flexborrow*, 255 F. Supp. 3d at 422 (dismissing where plaintiff failed to "identify any statements made by defendant that were fraudulent, much less the dates and the times those statements were made or the identities of the recipients," contrasting with a case where plaintiff adequately pled underlying offenses through a "highly detailed chart that laid out with specificity the allegedly fraudulent statements") (citing *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 173 (2d Cir. 1999)); *Soler*, 2020 WL 9815186, at *8 (dismissing where plaintiff failed to allege "who precisely was defrauded, or what detrimental reliance resulted from the allegedly false statements").

Here, Plaintiff's allegations of the ARS Defendants' purported mail and wire fraud fail to satisfy this standard. Although Plaintiff broadly alleges that ARS falsely represented LOVE as copyrighted to "hundreds if not thousands of individuals and entities," the AC never specifically identifies the dates and times of any of these statements, whom specifically they were made to, and how the (unnamed) recipients detrimentally relied on them. (*See* AC ¶ 75.) Despite the volume—and an opportunity to supplement prior allegations and provide detail via the AC—they

remain "sweeping and general allegations of mail and wire fraud" that fall far short of satisfying Rule 9(b). *See, e.g.*, *Flexborrow*, 255 F. Supp. 3d at 422; *Soler*, 2020 WL 9815186, at *8.[10]

### C.   Plaintiff Fails To Plead Proximate Causation.

Plaintiff's RICO claims should also be dismissed because he does not and cannot plead that the ARS Defendants' conduct proximately caused his inherently indirect market injury. A civil RICO plaintiff must allege "a direct causal connection" between the alleged racketeering and his injury. *Anza*, 547 U.S. at 460-61. Indirect injuries that would require "intricate, uncertain inquiries" to adjudicate are not cognizable, especially when alleged "by economic competitors," whose claims, "if left unchecked, could blur the line between RICO and the antitrust laws" and "overrun[] RICO litigation." *Id.* at 460. This is especially so when the injury is alleged lost sales, since "[b]usinesses lose and gain customers for many reasons," and when a plaintiff alleges that a competitor's racketeering caused it to lose sales, it "would require a complex assessment to establish what portion of [the] lost sales were the product of" racketeering versus "factors other than [the] alleged acts of fraud." *Id.* at 459-60. Moreover, "[t]he requirement of a direct causal connection is particularly appropriate where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." *Id.* at 460.

Courts thus frequently reject putative RICO claims asserting second-hand market injuries that depend on the actions of independent market actors and cannot be precisely attributed to a defendant's alleged racketeering. *See, e.g.*, *Anza*, 547 U.S. at 459-61 (reversing and finding no proximate cause from alleged tax evasion since plaintiff's lower sales could have resulted from factors other than the alleged fraud allowing defendant to undercut plaintiff's prices); *Hemi Grp.,*

---

[10] The closest Plaintiff even arguably comes to specifically identifying any allegedly fraudulent wire is when he alleges that certain Morgan Defendants made false copyright statements on a website and in an article published in 2011 in the Associated Press. (AC ¶¶ 83-84.) But these allegations would hardly show a pattern of racketeering and in any event do not apply to the ARS Defendants.

*LLC v. City of New York, N.Y.*, 559 U.S. 1, 11 (2010) (failure to plead proximate causation where "the conduct directly responsible for the City's harm was the customers' failure to pay their taxes," not the defendant's own actions); *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 142 (2d Cir. 2018) (competitor plaintiff who alleged liquor smuggling scheme failed to plead proximate causation because alleged harm was from retailer decisions, "asserted causal relationship" was "intricate and uncertain," and "New York State is a better situated plaintiff that was more directly harmed by the defendants' alleged racketeering"); *7 West 57th St. Realty Co., LLC v. Citigroup, Inc.*, 771 F. App'x 498, 504 (2d Cir. 2019) (no causation where "injury was directly caused by buy/sell decisions that independent market actors made, which [results of alleged fraud] may have influenced"); *Mackin v. Auberger*, 59 F. Supp. 3d 528, 557 (W.D.N.Y. 2014) (dismissing and agreeing "that injury theories claimed to result from frauds perpetrated on non-parties have been discredited by the United States Supreme Court and the Second Circuit Court of Appeals, and have been held insufficient to establish proximate cause as a matter of law").

Here, Plaintiff claims that he lost revenue and opportunities because he could not compete in the open market with ARS's allegedly false claims about LOVE's copyright status. This is precisely the sort of indirect market injury that courts have repeatedly held may not be redressed through civil RICO claims. In particular, the alleged injury is not direct because it depends on "independent market actors'" "decisions to purchase" licenses in LOVE rather than in HOPE. *See, e.g.*, *Empire Merchs.*, 902 F.3d at 142; *7 West 57th*, 771 F. App'x at 504. Relatedly, it "would require a complex assessment to establish what portion of" Plaintiff's claimed market share losses are attributable to Defendants' alleged racketeering rather than other factors, such as the reality (which Plaintiff previously conceded, *see* n.7, *supra*) that LOVE is older and more popular than HOPE. *See, e.g.*, *Anza*, 547 U.S. at 459-60; *Empire Merchs.*, 902 F.3d at 143 (rejecting causation

where plaintiff's "lost sales could have resulted from factors other than petitioners' alleged acts of fraud"). Finally, under Plaintiff's theory of the case, members of the public who purchased LOVE licenses or merchandise were more directly injured by Defendants' purported misconduct and would have more "straightforward" RICO claims (even though such would be meritless for all the reasons discussed herein). *See, e.g.*, *Empire Merchs.*, 902 F.3d at 144.

### D.   Plaintiff Fails To State A Civil RICO Conspiracy Claim.

Because Plaintiff fails to state a direct civil RICO claim, he necessarily fails to state a claim for civil RICO conspiracy under 18 U.S.C. § 1962(d) (*see* AC ¶¶ 103-115), and that claim should be dismissed as well, *see, e.g.*, *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 164 (2d Cir. 2004) (affirming dismissal of "RICO conspiracy claims [that] are entirely dependent on [plaintiffs'] substantive RICO claims"). Like with his § 1962(c) claim, Plaintiff must plead, *inter alia*, scienter and agreement to commit multiple acts of racketeering with particularity, yet has not sufficiently done so. *See, e.g.*, *id.*; *Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 25 (2d Cir. 1990) (affirming dismissal where plaintiff did "not allege facts implying any agreement involving each of the defendants to commit at least two predicate acts," explaining that "[b]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement"); *Goldfine v. Sichenzia*, 118 F. Supp. 2d 329, 406-07 (S.D.N.Y. 2000) (dismissing where "the complaint does not allege that each defendant agreed to commit two or more predicate acts"). And as above, Plaintiff has failed to plead proximate causation for his alleged second-hand market injury and therefore has also failed to state a RICO conspiracy claim. *See Hecht*, 897 F.2d at 25.

### CONCLUSION

For the foregoing reasons, the Court should dismiss this case with prejudice.

Dated: New York, New York
   January 23, 2023

Respectfully submitted,

**COWAN DEBAETS ABRAHAMS**
**& SHEPPARD, LLP**

By: /s/ Scott J. Sholder
Scott J. Sholder, Esq.
Benjamin S. Halperin, Esq.
41 Madison Avenue, 38th Floor
New York, New York 10010
Telephone: (212) 974-7474
Fax: (212) 974-8474

*Attorneys for Defendants Artists Rights*
*Society, Inc. and Janet Hicks*

## **CERTIFICATE OF SERVICE**

I, Scott J. Sholder, hereby certify that true and correct complete copies of the foregoing

Defendants Artist Rights Society and Janet Hicks's Memorandum of Law in Support of their

Motion to Dismiss, Declaration of Scott J. Sholder and the accompanying exhibit have been served

on all counsel of record via the Court's CM/ECF service.

/s/ Scott J. Sholder

Scott J. Sholder
