**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL MCKENZIE, individually and doing business as AMERICAN IMAGE ART, an unincorporated d/b/a,<br><br>    Plaintiff,<br><br>    v.<br><br>ARTISTS RIGHTS SOCIETY, INC., and JANET HICKS, et al.,<br><br>     Defendants. | CIVIL NO. 1:22-cv-01619-JHR |

**OPPOSITION MEMORANDUM OF PLAINTIFF MICHAEL MCKENZIE dba AMERICAN IMAGE ART TO DEFENDANTS ARTISTS RIGHTS SOCIETY INC. AND JANET HICKS' MOTION TO DISMISS**

Date: February 6, 2023

Respectfully submitted,

*/s/ John J. E. Markham, II*
John J. E. Markham, II (JM4744)
MARKHAM READ ZERNER LLC
11A Commercial Wharf West
Boston, Massachusetts 02110
Tel: (617) 523-6329
Fax: (617)742-8604
*jmarkham@markhamreadzerner.com*
*Attorney for Plaintiff Michael McKenzie dba*
*American Image Art*

## TABLE OF CONTENTS

Table of Authorities ................................................................................................................ iii

The Competing Images .......................................................................................................... 1

Neither HOPE nor LOVE were Ever Copyrighted ........................................................ 3

ARGUMENT............................................................................................................................ 8

I. The Standard Under Which 12(b)(6) Motions Are Considered ................................. 8

II. Defendants Have Engaged in Disseminating a Literal False Statement in Interstate
Commerce Concerning Goods and Services Licensed by Them; This is False Advertising
that Violates the Lanham Act.............................................................................................. 8

III. The RICO Claim Should Not Be Dismissed ........................................................... 16

    A. The Statute of Limitations Does Not Bar McKenzie's RICO Claim ........................ 16

    B. Rule 9(g) is Satisfied ................................................................................................ 17

    C. Specific Instances of Mail and Wire Fraud Are More Than Adequately Alleged and
    Surely Form a RICO Pattern ........................................................................................ 19

    D. McKenzie Has Adequately Alleged Injury................................................................ 23

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Agence France Presse v. Morel*, 769 F. Supp. 2d 295 (S.D.N.Y. 2011) ...................................... 12

*Agency Holding Corp. v. Malley–Duff & Assocs., Inc.,* 483 U.S. 143, 107 S.Ct. 2759,
     97 L.Ed.2d 121 (1987) ............................................... 16

*Alix v. McKinsey & Co.*, 23 F.4th 196 (2d Cir.), *cert. denied,* 214 L. Ed. 2d 132,
     143 S. Ct. 302 (2022) ............................................... 24-25

*American Tel. & Tel. Co. v. Winback and Conserve Program, Inc.,*
     42 F.3d 1421 (3d Cir.1994) ............................................... 13

*Anatian v. Coutts Bank (Switzerland) Ltd*., 193 F.3d 85 (2d Cir. 1999) ...................................... 18

*Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) ............................................... 24

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................... 8, 9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................... 8

*Bingham v. Zolt*, 66 F.3d 553 (2d Cir. 1995) ....................................... 16, 17

*Boyle v United States*, 556 U.S. 938, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009) ....................... 23

*Colony at Holbrook, Inc. v. Strata G.C., Inc*., 928 F.Supp. 1224 (E.D.N.Y. 1996) ................... 19

*Conopco, Inc. v. Campbell Soup Co*., 95 F.3d 187 (2d Cir. 1996) ............................................. 16

*Dastar Corp. v. Twentieth Century Fox Film Corp*., 539 U.S. 23 (2003) ................................. 12

*EFS Mktg., Inc. v. Russ Berrie & Co*., 76 F.3d 487 (2d Cir. 1996) ............................................. 15

*Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132 (2d Cir. 2018) ................. 23

*Jianjun Lou v. Trutex, Inc.*, 872 F. Supp. 2d 344 (S.D.N.Y. 2012) ............................................ 5

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118,
     134 S. Ct. 1377, 188 L. Ed. 2d 392 (2014) ...................................... 14

*Lokai Holdings LLC v. Twin Tiger USA LLC*, 306 F. Supp. 3d 629 (S.D.N.Y. 2018) ............... 11

*McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.,* 938 F.2d 1544 (2d Cir.1991) ..................... 13

*Moore v. PaineWebber, Inc.,* 189 F.3d 165 (2d Cir. 1999) ........................................................ 18

*Morgan Art Found. Ltd. v. McKenzie,* No. 18CV4438ATBCM, 2021 WL 863264
    (S.D.N.Y. Jan. 22, 2021) ...................................................................................................... 5

*Merck Eprova AG v. Gnosis S.p.A.,* 760 F.3d 247 (2d Cir. 2014) ........................................ 11, 13

*Nat'l Basketball Ass'n v. Motorola, Inc.,* 105 F.3d 841 (2d Cir. 1997) ...................................... 13

*Parks v. ABC, Inc.,* 341 F. App'x 737 (2d Cir. 2009) .................................................................. 15

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000) .......................................................................... 5

*Shields v. Citytrust Bancorp, Inc*., 25 F.3d 1124 (2d Cir. 1994) ................................................ 19

*Tiffany (NJ) Inc. v. eBay Inc*., 600 F.3d 93 (2d Cir. 2010).......................................................... 13

*United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) ................. 22-23

**Rules, Statutes, Treatises**

Rule 9, Fed. R. Civ. P. .......................................................................................................... 17-19

Rule 12, Fed. R. Civ. P. ......................................................................................................... *passim*

18 U.S.C. § 1341............................................................................................................... 20-22

18 U.S.C. § 1343............................................................................................................... 20-22

18 U.S.C. § 1961............................................................................................................ 1, 21-22

Section 43, Lanham Act...........................................................................................…... 10

3 McCarthy on Trademarks § 27:35........................................................................................ 13

Plaintiff Michael McKenzie *d/b/a* American Image Art ("McKenzie") submits this Memorandum in Opposition to the Motion by Defendants Artist Rights Society, Inc. ("ARS") and Janet Hicks ("Hicks") to Dismiss (Dkt. No. 26) McKenzie's Amended Complaint under Rule 12(b)(6). There are three Counts alleged in McKenzie's Amended Complaint (Dkt. No. 25) (hereinafter, "AC"). Count I arises under the Lanham Act (15 U.S.C. § 1125(a)) and Counts 2 and 3 arise under the RICO statute (18 U.S.C. § 1961 *et seq.*). All three are based on Defendants' long-time pattern of fraud extensively detailed in the AC and herein. Because Defendants either ignore or misunderstand many of McKenzie's allegations, this Opposition quotes liberally from the AC to show the Court what it actually alleges.

**The Competing Images**

Defendants and McKenzie compete in the production and offering for sale of two similar and each a highly prized image created by the now-deceased Robert Indiana, a revered American pop artist who rose to fame in the 1960s. Defendant Morgan Art Foundation ("Morgan")[1] produces and markets sculptures, prints and silkscreens of Indiana's well-known "LOVE" image. Morgan has licensed the LOVE image to Defendant ALS so that, for profits split between them, ARS sub-licenses the LOVE image to anyone wanting to use it on their commercial products and

---

[1]     The Amended Complaint added Morgan as a party and it has not yet been served. McKenzie initially sued only defendants ALS and Hicks, doing so on February 27, 2022 (Dkt. No. 1). After some procedural skirmishing about the effectiveness of service, counsel agreed that ARS would accept service of the summons and complaint and the parties agreed to a schedule so ordered by the Court, the Honorable Mary Kay Vyskocil, whereby McKenzie would amend his complaint by December 16, 2022, Defendants Hicks and ALS would respond within 14 days and, if they moved to dismiss, the parties would brief the motion as governed by the Rules as to timing.  The Amended Complaint adds Morgan and its principal officers as Defendants and invited Morgan's counsel to accept service. We received no response and they have not appeared. Of course, if we prevail on this motion as we show herein that we should, they will be promptly served.

it is the advertising and other statements made by Morgan and ALS about the LOVE image that are the heart of this case.   The LOVE image (AC ¶ 18) is depicted next below:



This LOVE image was created in the 1960s and its popularity was instant.

McKenzie produces and markets Indiana's HOPE image (AC ¶ 52) depicted here:



In 2008, McKenzie, working with Indiana, conceived of the HOPE image. (AC ¶52) In early 2008, then presidential hopeful Barack Obama had tired of his then campaign mantra of "Change" and was considering reshaping his central message to the concept of "Hope," a concept from his 2006 book titled *The Audacity of Hope*. (AC ¶53)

McKenzie presented the HOPE image to the Obama campaign (AC ¶54) which decided to exhibit a massive HOPE sculpture at the entrance of the 2008 Democratic nominating convention in Denver, Colorado. That prominent display caused it to be seen repeatedly by millions of people who watched the televised presidential convention; and after the nomination, the Obama campaign used the HOPE image[2] throughout its campaign (AC ¶ 55), thus rendering HOPE a highly visible and a highly popular image. (*Id.*) HOPE and LOVE became competitors, as the AC alleges (at ¶ 60):

> Because of HOPE's similarities in form and overall design to the LOVE image, and HOPE's creation by the same artist, Robert Indiana, HOPE and LOVE became competitive symbols. While LOVE had clearly the more public recognition at the time of the creation of HOPE in 2008, the HOPE image appealed to the same audience that had been so taken with the LOVE image . . . . HOPE was between the two the more currently relevant and it was refreshingly new.

**Neither HOPE nor LOVE were Ever Copyrighted**

HOPE was, like LOVE, never copyrighted (AC ¶¶ 23, 24, 55) and for his part regarding this HOPE image, McKenzie has never so claimed. (AC ¶ 4) However, as shown below, Defendants have repeatedly claimed to the public that LOVE is in fact copyrighted, giving Defendants' marketing of the LOVE image a competitive edge over HOPE as explained further below.

---

[2]     In the aftermath of the Denver convention, McKenzie worked with the Obama campaign to create numerous licensed products including hats, shirts, jewelry, posters, notecards, bumper stickers, and prints—all of which produced large income for the Obama campaign. (AC ¶55)

Yet Indiana simply never copyrighted the LOVE image. (AC ¶¶ 4, 23, 24, 34, 55) From its creation in the 1960s, Indiana published the LOVE image repeatedly for decades in the form of large statues publicly exhibited, and on many other forms of artwork, on greeting cards, billboards publicly displayed, and always did so without any copyright notice that it was subject to a copyright. (AC ¶ 19) The image is in the public domain and has been since Indiana began publishing it without a copyright notice in the 1960s. (*Id.*)

Defendants attempt to convince this Court otherwise based solely on what they tell this Court was Indiana's "belief" (Defendants' Memorandum in Support of Motion to Dismiss, Dkt. No. 27, herein, "Def. Mem", 9[3]) that LOVE was copyrighted. This is truly lame, as if such a belief is germane on this motion. Even if it were, that "belief" is simply not at all shown by what they offer.[4]  Moreover, the AC alleges repeatedly that the LOVE image is not copyrighted and explains that it was published many times without any copyright notice.  Last on this point, in the other litigation between Indiana and Morgan, which ALS refers to at Def. Mem. 9, note 5,

---

[3]     The page numbers of Defendants' Memo referenced are the page numbers from the ECF filing stamp at the top of the memorandum.

[4]     Defendants attach to their motion a unilaterally redacted contract purportedly between Morgan and Indiana although not signed by Morgan. (Def. Memo p. 9 at footnote 3; see also Ex. A of the Sholder Declaration at Dkt. No 28-1). This "contract" is offered triumphally to proclaim to this Court that Indiana "did not believe" that LOVE was not copyrighted (Def. Mem. p. 3), since Indiana assigned to Morgan "all my trademarks, copyrights, and other rights." (*Id.*). However, there is absolutely no mention in that contract of a copyright on the LOVE image, and the document's reference to "all my copyrights" is certainly not proof of such a copyright on LOVE or even that Indiana believed that there was one. Also, no contract between two people creates or preserves a copyright, which is done by copyright registration and a "notice of copyright" each time the work is publicized. The Copyright Act, 17 U.S.C. §§ 10, provides that: [A]ny person entitled thereto by this title may secure copyright for his work by publication thereof with the notice of copyright required by this title; and such notice shall be affixed to each copy thereof published or offered for sale in the United States by authority of the copyright proprietor . . ." A copyright, if it ever existed, is abandoned from what is alleged in the AC, namely, "wide circulation of the copies without notice." *Capitol Recs., Inc. v. Naxos of Am., Inc.,* 262 F. Supp. 2d 204, 212 (S.D.N.Y. 2003).

Morgan does not allege that it owns a copyright on LOVE. While it mentions LOVE many times, it does not assert that it is copyrighted and only alleges that "Morgan Art Foundation is the owner of valid copyrights in "The Ninth American Dream" and "USA FUN" (collectively "the Copyrighted Images"). *See Morgan Art Foundation, McKenzie, et al* No. 18-CV-4438(AT)(BCM) (S.D.N.Y 2018), at ¶ 19; 112. It only asserts a trademark on the LOVE Image *Id.*, ¶ 118. The U.S. Trademark Office indeed shows a trademark (not a copyright) which Morgan applied for on August 24, 2017, just months before it filed its lawsuit against McKenzie and certainly does not make true the false assertion that it had a copyright on the LOVE image, an assertion it and Defendant ARS have been making since 1999. (AC ¶ 32)[5]

There simply is no LOVE copyright. Since 1999, however, ALS, in concert with Morgan, has repeatedly licensed the LOVE image, publicly asserting that it was copyrighted and that they own that copyright. These licenses have been sold to all manner of manufacturers, vendors, and retailers who make periodic royalty payments to Morgan and ARS. (AC ¶¶ 32, 33) These licenses provide that the licensees may use, for a royalty payment based on volume, the LOVE image on products they produce and sell, such as paintings, sculptures, prints, t-shirts, pencil sharpeners, glassware, sneakers and other items large and small. (AC ¶¶ 32, 33; *see also* Exhibit A of the AC which is a copy of the agreement between Morgan and ARS to offer these licenses to people selling all manner of products itemized in that contract)  These products, with the LOVE image on them to enhance their marketability, can be found offered for sale in thousands

---

[5]     In the Rule 12(b)(6) context, a court may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case *sub judice.*" *Jianjun Lou v. Trutex, Inc.*, 872 F. Supp. 2d 344, 350 n.6 (S.D.N.Y. 2012); *see also Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000)

of venues from gift shops and novelty stores to museums shops and antique stores, sidewalk vendors as well as through Amazon and eBay, among other outlets and in art galleries. (AC ⁋28)

The Morgan/ARS agreement is premised on the fraudulent assertion that Morgan has an enforceable copyright on the LOVE image. The agreement insists, and this is the heart of the fraudulent scheme alleged in the AC, that any license issued by ARS of the LOVE image to any licensee must require that licensee to place on any product produced by that licensee the assertion that the LOVE image is the subject of a copyright owned by Morgan and ARS. *See* paragraph 8 thereof (Exhibit A to the AC and AC ¶¶ 33-37) which reads as follows:

> ARS shall include as a condition of each license a requirement that the following copyright notice accompany the licensed reproduction:
>
> © [year of publication] Morgan Art Foundation, Ltd. /Artists Rights Society (ARS), New York.

In relation to any and all licenses conferred by ARS of the LOVE image for use on any product sold by any licensee, the above-quoted provision was an agreement between the Defendants to commit fraud on any and all licensees, and on any and all members of the public who thereafter purchased any of the products offered by these licensees containing the LOVE image and the false assertion that it was the subject of a copyright. (AC ⁋38) For example:



(*See* AC ¶ 40) The AC also alleges (at ¶ 34) that all the Defendants well knew that the representation and warranty in the Morgan/ALS agreement were false and have always known that the LOVE image has for many years been in the public domain and therefore Morgan was not, as it relates to the LOVE image, "the sole and exclusive owner of the worldwide rights to reproduce, promote, license and sell images of works" at least as that was claimed to apply to the LOVE image. (*Id.*)

The AC also alleges that Morgan and ARS have been fraudulently licensing their falsely-claimed copyright on the LOVE image, charging many hundreds of licensees monthly or quarterly royalties on the sale by these licenses of their products which contain the allegedly copyrighted LOVE image with the false assertion of a copyright notice embossed on each such product. (AC  ¶ 4) It also alleges that each licensee paid these royalties after  receiving the knowingly false and fraudulent representation that the LOVE image was copyrighted exclusively to Morgan and to ARS, and that it was only available for the use by licensees by and through Morgan and ARS, and worth paying money to Morgan and ARS under a license agreement so that the licensees could have permission to market the highly popular LOVE image as part of their products. (AC ¶ 42)

Moreover, the AC alleges (AC ¶ 43) that the fraud also caused the licensees to believe that, without paying money for a license to use the LOVE image, and without thereafter paying royalties on the sales of the items subject to that license, that licensee was not allowed by law to use the LOVE image on its products. All the money paid by all the licensees of the LOVE image in relation to all products thus sold was procured by the fraud of Defendants who publicly sold, and continue to sell, this fraud by use of wire communications in interstate commerce. (*Id.*)

Since in or around 1999 the licensees have paid royalty payments to ARS and those payments come either through the United States mails or by bank wire transfer and as Defendants Hicks testified in the Morgan case (AC ¶ 76(i)) ARS has paid over to Morgan 75% of the royalties thus paid to ARS, also by bank wire transfer. As shown below the facts alleged support the Lanham Act and RICO claims alleged in the AC.

## ARGUMENT

### I.      The Standard Under Which 12(b)(6) Motions Are Considered

A Rule 12(b)(6) motion to dismiss should be granted if the plaintiff fails to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). McKenzie's AC meets that burden. His allegations are way beyond speculative and indeed are factually grounded in large part on the deposition of Defendant Hicks, taken in the Morgan case referred in the AC at ¶¶ and in Defendants arguments.

### II.     Defendants Have Engaged in Disseminating a Literal False Statement in Interstate Commerce Concerning Goods and Services Licensed by Them; This is False Advertising that Violates the Lanham Act

AC Count 1 alleges, among other wrongs, false advertising. (AC ¶¶ 5, 15, 64, 66-68) The AC alleges that Defendants have falsely advertised their goods and services in a way actionable under the Lanham Act. First, Defendants have represented to the public that they own a copyright to Indiana's LOVE image, by making the claim, as alleged at AC ¶ 67, that the LOVE image is **"Artwork: © Morgan Art Foundation Ltd./Artists Rights Society (ARS), NY"** and therefore, that the goods distributed by their licensees with the affixed LOVE copyright symbol are held out as possessing a quality of "authenticity" that is exclusive to goods bearing the name

of Morgan Art and ARS. Second, they have represented to the public that they are the exclusive licensor of all Indiana copyrights to the LOVE image, and therefore, consumers and potential licensees are led to believe that any lawful use of the LOVE mark created by Indiana requires a license agreement from the Defendants under which they must pay Defendants monthly or quarterly royalty fees, *and* requires that these licensees affix that false assertion of copyright on each product they offer for sale or actually sell. Third, these false statements are alleged at AC ¶ 67 to appear in promotional content, advertising, found on Defendants' *RobertIndiana.com* website, on goods offered and sold in interstate commerce, and in other promotional licensing materials.

Defendants tell this Court that it should ignore McKenzie's allegation that there is no copyright because "the Court need not take that allegation as true at the pleading stage because whether a work is in the public domain is a legal conclusion, citing *Iqbal*, *supra*, 556 U.S. at 678. (*See* Def. Mem. 9, note 6).Yet McKenzie's AC goes way beyond the "labels and conclusions" (*id.*)  declared insufficient in *Iqbal*, specifically alleging the fact that, when McKenzie investigated with the US Copyright Office, "there was no copyright registered with it for LOVE in the name of anyone." (AC ¶ 101). Moreover, the AC does not simply conclude that the LOVE image is in the public domain, it specifically makes factual allegations that:

> Indiana published the LOVE image repeatedly for decades on statues publicly displayed, and in many other forms of artwork, on greeting cards, billboards publicly displayed, and always did so without any assertion that it was subject to a copyright. The image is and has been since Indiana began publishing it without a copyright notice in the 1960s, in the public domain. In fact the Museum of Modern Art which first commissioned LOVE as a postcard in or around 1964, did so without a copyright notice.

(*See,* AC, ¶ 19) The AC also alleges that Morgan has agreed with this. (*See* AC ¶ 20) The AC also specifically quotes Morgan's allegation in the other federal case telling the Court there that:

The year 1964 was a key moment that would mark an even higher level of fame for Robert Indiana: he created a work depicting four colored letters, L-O-V-E, with the "LO" stacked on the "VE" and the "O" notably tilted outward to the right. The image, called *LOVE*, went viral. It originated as a work on paper and was then used by Indiana in paintings and sculpture. It was published on posters and plastered on commercial products. It was selected for a Christmas card published by The Museum of Modern Art. It was translated by Indiana into new original artworks depicting the *LOVE* image in multiple other languages, including Hebrew, Spanish, and Chinese. It became one of the most recognizable sculptures in the world and was placed in various public spaces, including the well-known "Love Park" in Philadelphia, Pennsylvania. In 1973, the U.S. Postal Service printed 330 million U.S. postage stamps bearing the *LOVE* image.

(*See* AC ¶ 20)[6] AC's allegations related to the non-copyrighted status of LOVE are way beyond conclusions of law.

Lanham Act § 43(a) provides that:

> "(1) Any person who, on or in connection with any goods or services ... uses in commerce ... any ... false or misleading description of fact, or false or misleading representation of fact, which—
> . . .
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a)(1).

The above-quoted portion of § 43(a) provides the basis for what is generally known as "false advertising." To establish false advertising under Section 43(a) of the Lanham Act, the plaintiff must first demonstrate that the statement in the challenged advertisement is false. The AC certainly does that as shown by the quotes from it above. Falsity may be established, among other ways, by showing that the advertising is literally false as a factual matter, which the AC

---

[6]    Defendants assert that, despite Morgan's quote, they will show that "Indiana's LOVE image did not fall into the public domain because Indiana did not intend for LOVE to fall into the public domain" (Def. Mem., page 9, note 6). This promise of proof of Indiana's state of mind, even if relevant, is contrary to the AC's allegations and is clearly not a basis for a 12(b)(6) dismissal.

certainly alleges many times, and showing that the false or misleading statement has been placed in interstate commerce (which the AC alleges)[7],  and that McKenzie has been injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products. *See, Merck Eprova AG v. Gnosis S.p.A.,* 760 F.3d 247, 255–56 (2d Cir. 2014). *See below* commencing at page 23, "McKenzie Has Adequately Alleged Injury."

As alleged in the AC, Defendants make both literal and implied false statements.  The literal false statement is that they own the copyright when there is none and that goods promoted and sold by their licensees require the affixation of a copyright symbol falsely asserting that they own the LOVE copyright and that only goods with the copyrighted LOVE symbol were authentic Indiana authorized goods. (AC ¶¶ 37-41, 61) "When determining whether a statement is literally false—that is, if it "conflicts with reality"—a court may "rely on its own common sense and logic in interpreting the message of the advertisement." *Lokai Holdings LLC v. Twin Tiger USA LLC*, 306 F. Supp. 3d 629, 638 (S.D.N.Y. 2018).

In addition, Defendants made false statements that the only way to obtain a valid license to use the LOVE mark or any other Indiana artwork is by obtaining (by paying royalties) a license from them. (AC ¶¶ 64,67-68) The implied falsity is that any other goods affixing a

---

[7]     For example, AC ¶ 107 alleges that "ARS and Morgan have asserted publicly and repeatedly that they have a copyright on the LOVE image even though they well know that no such copyright exists, and they have made these assertions via the internet using interstate wire communications to make such assertions . . . ." *See also* AC ¶¶ 67 and 68 that allege that ". . . . in a website called *RobertIndiana.com*, Defendant Morgan through its agents who maintain the website states that the LOVE image is copyrighted to Morgan and to ARS and this is a website that attracts the general public and potential licensees. It actually displays the LOVE image with the copyright notice. Under the LOVE image displayed on the website the following is asserted: **"Artwork: © Morgan Art Foundation Ltd./Artists Rights Society (ARS), NY"** *This false assertion is on a website that communicates in interstate and foreign commerce* and has caused and continues to cause the affixation of a false copyright notice on thousands of products under many hundreds of licenses requiring such affixation and then to be sold to the general public with that false assertion on each and every product." (emphasis added)

11

replication of an Indiana artwork are non-authentic and that a competitor, like McKenzie, offering Indiana artwork (HOPE) did so without the valuable cachet of an assertion that HOPE is copyrighted and thus that the affixation of that competing artwork is of lesser value.

Moreover, McKenzie's false advertising claim is distinguishable from the copyright cases cited by Defendants, and particularly Defendants reliance (Def. Mem. 17 and 19) on *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003) and *Agence France Presse v. Morel*, 769 F. Supp. 2d 295, 308 (S.D.N.Y. 2011) is misplaced. The import of these cases is that an "author's recourse for unauthorized use is in copyright." *Agence France Presse*, 769 F. Supp. at 308, i.e., not under the Lanham Act.  In contrast to the plaintiffs in *Dastar* and *Agence France Presse*, Mckenzie is *not* alleging, as were the plaintiffs in *Dastar* and *Agence*, that Defendants have claimed a work he authored or created as their own, or that Defendants are infringing his copyright by failing to give him proper attribution. Instead, McKenzie is alleging that the Defendants are falsely advertising *that they have a copyright and that only goods marketed having that copyright attached are authentic* goods and are falsely advertising that anyone interested in selling goods depicting Indiana's LOVE image must obtain a license from them.

McKenzie is not alleging false claims of authorship triggering *Dastar's* holding that "authorship is not a material fact" under Lanham Act § 43(a)(1)(A), because it does not speak to the "origin" of the good." 539 U.S. 23, 32–33, 37 (2003). Nobody is claiming that Morgan and ARS are the authors. Indiana is. What McKenzie is alleging that Defendants are doing is advertising on a website that they own the rights to LOVE and they insist that a payment to them for the right to sell the goods and products bearing LOVE is a right that allows them to prevent their competitors from selling competitive goods with the same LOVE embossed on them. That is a lie or, using the accurate legal adornment, false advertising.

A plaintiff must also allege that the Defendants misrepresented an inherent quality or characteristic of Defendant's goods or services. This requirement is essentially one of materiality, a term explicitly used in other Circuits. *See American Tel. & Tel. Co. v. Winback and Conserve Program, Inc.,* 42 F.3d 1421, 1428 n. 9 (3d Cir.1994) (plaintiff alleging false advertising must prove "that the deception is material in that it is likely to influence purchasing decisions"); *see also* 3 *McCarthy on Trademarks* § 27:35 at 27–54 (there must be "some showing that the defendant's misrepresentation was 'material' in the sense that it would have some effect on consumers' purchasing decisions."); *Nat'l Basketball Ass'n v. Motorola, Inc*., 105 F.3d 841, 855 (2d Cir. 1997). That effect is clearly alleged. *See* allegations that many licensees pay royalties for what they believe is LOVE copyright use authorization. (AC ¶¶ 42, 43)

The clear allegations in the AC are that ARS has made statements that are literally false and deliberately misleading. Therefore, the materiality and consumer deception of the false statement is presumed.  Our courts have found that "where an advertising claim is literally false, 'the court may enjoin the use of the claim without reference to the advertisement's impact on the buying public." *Tiffany (NJ) Inc. v. eBay Inc*., 600 F.3d 93, 112 (2d Cir. 2010) (quoting *McNeil– P.C.C., Inc. v. Bristol–Myers Squibb Co.,* 938 F.2d 1544, 1549 (2d Cir.1991)). And even in cases of *implied falsity,* where a plaintiff adequately demonstrates that a defendant has intentionally set out to deceive the public… a presumption arises that consumers are, in fact, being deceived." *Merck Eprova AG v. Gnosis S.p.A.,* 760 F.3d 247, 256 (2d Cir. 2014). Moreover, the *Merck* court applied a presumption of harm when analyzing the element of competitive injury since there was evidence of literal falsity or deliberate deception. The Court reasoned that, while a presumption of harm was "disfavored in cases where the *products are not obviously in competition . . . ,*" that the presumption was appropriate where the parties were in direct competition. *Id.*  The false

13

assertion of a LOVE copyright is thus not only presumed to cause damage, it is obviously

material from the fact that Defendants have been getting payments from thousands of licensees

who wish to pay for the right to use LOVE on their products by reason of the copyright assertion

as it prevents their competitors from using the LOVE image, adding the cache of the LOVE

image to adorn whatever the product is.

      The point is that it also prevents HOPE from gaining the same cache unless McKenzie

also lies about HOPE's copyright status.  McKenzie's harm is not "remote."

> . . . while a competitor who is forced out of business by a defendant's false
> advertising generally will be able to sue for its losses, the same is not true of the
> competitor's landlord, its electric company, and other commercial parties who
> suffer merely as a result of the competitor's "inability to meet [its] financial
> obligations.

*Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 134, 134 S. Ct. 1377, 1391,

188 L. Ed. 2d 392 (2014).  McKenzie alleges that he and ARS were and are competing in the

same market channels for the same type of consumers and licensees (AC §§45, 48-55, 60-61). As

a result of the Defendants false statements disseminated to consumers and licensees on their

commercial website, McKenzie alleges that he has experienced a diversion of sales and a

lessening. (AC ¶¶ 48, 56,60-61) That is sufficient for alleging injury under the Lanham Act.

      Defendants also seek false comfort in cases holding that a mere assertion of a copyright

does not give rise to a false advertising claim under the Lanham Act. (Def. Mem. 13-15) The law

here is not that simple, and it does not apply to the circumstances alleged in McKenzie's AC.

The Second Circuit has held that "as a matter of law, a false copyright notice *alone* cannot

constitute a false designation of origin within the meaning of § 43(a) of the Lanham Act."

*Lipton v. The Nature Co.,* 71 F.3d 464, 473 (2d Cir.1995). (emphasis added) And the Second

Circuit make clear that this preclusion of use of the Lanham Act only applied in the following

narrow circumstance:

> Where, as here, the alleged wrongdoing is a Lanham Act violation, not a misuse of copyright, the *requirement of some additional misrepresentation of originality underscores false advertising's emphasis on consumer reliance.* A naked copyright symbol such as the one utilized by Berrie, a small, *almost imperceptible mark on the bottom of a doll's foot*, is not very likely to influence consumer purchasing decisions. *Cf.*

*EFS Mktg., Inc. v. Russ Berrie & Co.*, 76 F.3d 487, 492 (2d Cir. 1996) First, the copyright notice on products marketed with the LOVE image (*see* p. 6 above and AC ¶ 40) are hardly "imperceptible." The AC alleges more than "an almost imperceptible mark." AC ¶65 alleges that Defendants' false advertising goes far beyond mere display of a small "©" somewhere on the products of the licensees. Defendants require that all licensees display on each item sold under each license depicting the LOVE image the following: "© [year of publication] Morgan Art Foundation, Ltd. /Artists Rights Society (ARS), New York." More importantly, Defendants also post this assertion as an advertisement in a website called *RobertIndiana.com.* (AC ¶ 67)[8]

Nor is "laches" properly decided under 12(b)(6) as it raises factual questions about notice and prejudice to Defendants. The 12(b)(6) case cited by Defendants (Def. Mem. 16), did allow such dismissal. While that case notes that "every act of infringement is a "distinct harm" that gives rise to an independent claim for relief," *Parks v. ABC, Inc.*, 341 F. App'x 737, 739 (2d Cir. 2009), the Second Circuit in *Parks* noted that the pleadings showed that Plaintiff knew of the infringement as of 1970 and the Defendant being sued sold the copyrights in 1979. Thus, on the pleadings and because the Plaintiff filed suit in the 1990s, there could be no sales within the 6-year Lanham Act limitations statute. The other case cited by Defendants was decided after trial

---

[8]     Defendants seem to acknowledge the importance of this advertisement as they tell this Court, at Def. Mem. 24, that "[The] AC identifies *no actual advertisements* or organized campaign to penetrate the relevant market with the allegedly false claims about LOVE's copyright status." (AC ¶ 66) Yet they ignore the allegation (AC ¶ 67) referring to Defendants' "Robert Indiana" website alleging just that. Moreover, the AC alleges that Defendants "also vigorously enforce the terms of the license requiring that [LOVE copyright]  posting."

and could not even be decided on summary judgment: "Defendant moved for summary judgment

on the basis of laches. The district court denied Campbell's motion, finding that issues of

material fact remained in dispute.*Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 190 (2d Cir.

1996).

### III.    The RICO Claims Should Not Be Dismissed

### A.  The Statute of Limitations Does Not Bar McKenzie's RICO Claims

The four-year statute of limitations applicable to RICO cases[9] cannot be applied as

simplistically as Defendants urge this Court to do.  To begin with, Defendants ignore the

allegations that the Defendants' RICO conduct is alleged to be "a continuous course of conduct"

(AC ¶ 73) and that the RICO conduct was "commencing in mid-1999 and continuing as of the

date of the filing of this Verified Amended Complaint." (AC ¶ 76). Thus, no matter when this

Court or the jury find that McKenzie was put on notice of Defendants conduct, he may claim and

receive damages for any harm caused by conduct occurring in the last four years before the filing

of this action. *See, Bingham v. Zolt*, 66 F.3d 553, 559–60 (2d Cir. 1995) where the RICO

defendants had been engaging in a pattern of embezzling funds from the estate of the iconic

signer Bob Marley over many years and that the plaintiff had known about this for more than

four years. At trial:

> The jury found the estate had actual knowledge of defendants' wrongful acts more
> than four years prior to suit, but that it had suffered $1,050,000 in injuries—of
> which $800,000 were allocated as RICO injuries—*after* December 31, 1982. The
> district court ruled that the estate's previous knowledge of the underlying
> wrongful acts did not bar its action as to these RICO injuries under the "separate
> accrual" rule of *Bankers Trust* . . . * * * In holding that the estate could recover
> from defendants for RICO injuries occurring after December 31, 1982, the district
> court correctly applied our separate accrual rule.

---

[9]     *See Agency Holding Corp. v. Malley–Duff & Assocs., Inc.,* 483 U.S. 143, 156–57, 107
S.Ct. 2759, 2766–67, 97 L.Ed.2d 121 (1987).

*Bingham v. Zolt*, 66 F.3d 553, 559–60 (2d Cir. 1995)

As to whether to credit McKenzie's allegations that he did not discover the copyright scheme alleged in the AC until Defendant Hicks disclosed it in her deposition taken on February 25, 2020 (AC ¶ 101) or, instead, Defendants' argument (Def. Mem. 12-13) that McKenzie knew about this use of a non-existent LOVE copyright much earlier, this Court should defer any finding until evidence is presented either at trial or on a motion for partial summary judgment on that issue. It is simply not an issue for disposition under Rule 12(b)(6), particularly given the separate accrual rule which allows this case to survive a statute of limitations bar in any event.[10]

We also note here that *Bingham* is an example of a RICO case that went to a jury trial and that the verdict in favor of Plaintiff was affirmed by the Second Circuit. There are many successful RICO cases. Congress has authorized such a claim and has never wavered from its long-ago enactment of the civil RICO provision, section 1964, nor have the courts if a claim is properly pleaded and proved. The fact that there are many poorly conceived RICO complaints (*see* Def. Mem. 24-25) means nothing about the pleading in this case. Poor pleadings in another case are not contagious. Our case should be viewed on its own merits and it adequately states a RICO case as explained next below.

**B.  Rule 9(g) is Satisfied**

---

[10]     Nor is the holding in *Morgan v. McKenzie* cited at Def. Mem. 15 even close to judicial estoppel as to the statute of limitations in this case. That holding denied McKenzie's right to file a Fourth Amended Complaint to amend to add new claims alleging that the LOVE copyright was a fraud, as the Court in Morgan ruled: "*In this case*, the deadline to amend the pleadings was set in paragraph 3 of the July 23, 2018 Scheduling Order and *had long expired* by the time McKenzie moved – towards the end of the fact discovery schedule – for leave to amend his answer for a fourth time. *Morgan Art Found. Ltd. v. McKenzie,* No. 18CV4438ATBCM, 2021 WL 863264, at *6 (S.D.N.Y. Jan. 22, 2021) (emphasis added). Not that it matters on the merits here, equally sloppy is Defendants' assertion that McKenzie's counsel here was his counsel that sought to amend the complaint in the Morgan case. That is false. The undersigned and his law firm came in to replace counsel after that motion was briefed and filed by prior counsel.

McKenzie's RICO claims "must satisfy the particularity requirements of *Fed.R.Civ.Pro*.

Rule 9(b)." *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172–73 (2d Cir. 1999), and:

> . . .a RICO plaintiff must "(1) specify the statements that the plaintiff contends
> were fraudulent, (2) identify the speaker, (3) state where and when the statements
> were made, and (4) explain why the statements were fraudulent."

*Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999). McKenzie quite

specifically does so in AC ¶ 67 and elsewhere:

> Moreover, in a website called *RobertIndiana.com*, Defendant Morgan through its
> agents who maintain the website states that the LOVE image is copyrighted to
> Morgan and to ARS and this is a website that attracts the general public and
> potential licensees. It actually displays the LOVE image with the copyright notice
> that **"Artwork: © Morgan Art Foundation Ltd./Artists Rights Society (ARS),
> NY"** This false assertion is on a website that communicates in interstate and
> foreign commerce . . .

This allegation thus identifies the fraudulent statement and certainly identifies the speaker (the

Morgan-based website) and AC ¶ 76(n) alleges that Defendant Morgan, acting through Salama-

Caro and Grossglauser, has maintained the Robertindiana.com website referred to above in

paragraphs 67 and 68 and that website communicates in wire communications in interstate and

foreign commerce to accomplish this fraudulent scheme. Certainly, these allegations "state

where and when these statements are made." The AC also repeatedly alleges the basis for the

fraud by alleging that "ARS and Morgan have asserted publicly and repeatedly (indeed on a

website called Robertindiana.com) that they have a copyright on the LOVE image even though

they well know that no such copyright exists . . ." (AC ¶ 76(a))[11]  Somehow Def. Mem. 7 tells

this Court that these allegations are not enough to allege knowledge of falsity because

---

[11]     McKenzie also alleges that on June 11, 2020 Morgan and its agents caused publication of
a news article telling the public that "[T]he  estate of pop artist Robert Indiana has reached a
settlement that keeps intact a longstanding relationship with Morgan Art Foundation, *which
holds the copyright for his iconic 1960s "LOVE" series*, to promote and preserve his work,
officials said Friday." (AC ¶¶ 84-85)

"Defendants' awareness of fraud is especially problematic given the complexity of the legal issue at the heart of the alleged fraud." There is certainly nothing "complex" here for New York based, sophisticated art producers (Morgan) and the premier entity representing artists all across the world (ARS). LOVE either is or is not copyrighted. It clearly turns out it is not.

The AC also satisfies the requirement that "the plaintiff must connect the allegations of fraud to each individual defendant." *Colony at Holbrook, Inc. v. Strata G.C., Inc.*, 928 F.Supp. 1224, 1231 (E.D.N.Y. 1996). The website itself links Morgan and ARS. It also claims that Hicks participates in this fraud (AC ¶¶ 79 (f)((j)(k) and (m) and 80) and alleges that Salama-Caro and Grossglauser maintain the website containing the fraudulent statement. The above allegations surely serve the purpose of Rule 9(g) which is to "provide a defendant with fair notice of a plaintiff's claim." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).

### C. Specific Instances of Mail and Wire Fraud Are More Than Adequately Alleged and Surely Form a RICO Pattern

Defendants tell this Court, at Def. Mem. 28, that:

Although Plaintiff broadly alleges that ARS falsely represented LOVE as copyrighted to "hundreds if not thousands of individuals and entities," the AC never specifically identifies the dates and times of any of these statements, whom specifically they were made to, and how the (unnamed) recipients detrimentally relied on them.

This argument utterly confuses two of RICO's requirements, namely the requirement discussed above relating to the 9(g) details required for the fraud statements and the requirement to specifically identify the mailings and wirings in furtherance of that fraud. Similarly revealing of Defendants confusion on these two separate requirements is their argument (Def. Mem. 29, note 10) where they tell this Court that:

The closest Plaintiff even arguably comes to specifically identifying any allegedly fraudulent wire is when he alleges that certain Morgan Defendants made false copyright statements on a website and in an article published in 2011.[12]

To be clear, the wirings themselves do not have to be fraudulent. They must *be in furtherance of the fraud*. 18 U.S.C. § 1343 prohibits:

> whoever, having devised or intending to devise any scheme or artifice to defraud . . . . transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce . . . for the purpose of executing such scheme or artifice . . .

The "in-furtherance-of" wording is the same in the mail fraud statute, section 1341. The fraudulent statements themselves, as distinct from the mailings and wirings in furtherance of that fraud, are, as explained above, alleged to have been posted on the RobertIndiana.com website asserting that Morgan and ARS own the LOVE copyright. (AC ¶ 67) Of course, that is an oft-repeated assertion made to anyone in the public who opens that website. It is also obviously true that each of the licensees receives this false copyright assertion since ARS is obligated to require that the licensee so affix that copyright on whatever product they are selling. However, these false statements are simply not the mailings or wirings on which McKenzie relies.

Instead, he specifically pleads as follows at AC ¶ 76 (g) through (i) and (m):

> (g) Each of the many hundreds of licenses thus fraudulently procured requires each licensee to pay quarterly royalties to ARS for use of the LOVE image. Some of the license fees paid by the licensees are by check sent through the United States mail. Each of these hundreds of mailings that began in 1999 and continue through the filing of this Verified Amended Complaint is in furtherance of the scheme to defraud and thus is a separate act of mail fraud in violation of 18 U.S.C. § 1941. Moreover, when each such check arrives at ARS it is deposited in an ARS bank account and thereafter collected by the Federal Reserve's interbank collection system which uses interstate wire communications to facilitate each check collection. There have been hundreds of such deposits and therefore hundreds of separate interstate wire communications to further this scheme. Accordingly, the collection of each of these licensee checks is a separate use of

---

[12]     The news article McKenzie alleges is actually in 2021, not 2011. *See* AC ¶ 84.

interstate wire communications in furtherance of the scheme to defraud in violation of the wire fraud statute, 18 U.S.C. § 1343.

(h) Some of the licensee payments each quarter, when not by check mailed to ARS, are sent by interbank wire transfer from the licensee's bank to the bank of ARS, and each such wire transfer is by use of an interstate wire communication and because each is in furtherance of the fraudulent scheme, each is a violation of the wire fraud stature, 18 U.S.C. § 1341.

(i) In addition, each quarter—four times per year, each year since 1999 when this fraudulent licensing began, and continuing to the date of this Verified Amended Complaint, ARS has paid to Morgan 75% of the license fee royalties ARS has received from the licensees for the sales of the products bearing the LOVE image. Each of the payments by ARS to Morgan has been, according to the testimony of Defendant Hicks recently given under oath, by bank wire transfer sent by wire communications in interstate commerce from ARS's bank to Morgan's bank. These wire communications have been repeated many times periodically, year in and year out, by ARS to Morgan from the proceeds of payments received by ARS from its licensees. All of these wire communications are in furtherance of the fraud described above and many of these wire communications continue as of the date of this Verified Amended Complaint. Specifically, according to Defendant Hicks, approximately two months after each quarter has ended and commencing in 1999, four times each year for twenty-two years, ARS has used bank wire transfers to pay to Morgan the 75% of the fraudulently procured royalty payments received by ARS for the preceding quarter. Each such bank transfer is an interstate wire communication and is in furtherance of Defendants scheme to defraud and thus each is a separate violation of 18 U.S.C. § 1343;

* * * * *

(m) Moreover, each quarter or semiannually, Defendant Hicks caused to have sent a report of the licensee fees earned under the falsely procured licenses from her office in New York to Defendant Grossglauser in Geneva, Switzerland, and each of these reports was sent by wire communications in foreign commerce. Each such wiring in furtherance of the fraudulent scheme and thus is a violation of the wire fraud statute, 18 U.S.C. § 1343.

These specific allegations describe the many mailings and wirings in furtherance of this fraud, each of which is a separate offense under 18 U.S.C. § 1341 (mail fraud), or 18 U.S.C. § 1343 (wire fraud) and each of these is a predicate offense under 18 U.S.C. § 1961, RICO's definitional section. Thus, they collectively constitute a "pattern of racketeering" under 18 U.S.C. § 1961(5) which insists on just two or more such acts within a five year period.

Moreover, and despite what Defendants assert, there is also money laundering, a separate predicate act under 18 U.S.C. § 1961(1). *See* AC ¶ 76(j) where this money laundering is alleged:

> The wire transfers from ARS to Morgan were not only additional interstate wire communications in violation of the wire fraud statute, each of these wirings from ARS to Morgan constitutes money laundering in violation of 18 U.S.C. §§ 1956(a) and 1957, because each such wire transfer was and each continues to be a transaction in proceeds of a specified unlawful activity because ARS and Hicks unlawfully obtained proceeds from its fraud on the licensees by the money they sent ARS and then ARS and Hicks sent those monies reflecting the amounts of royalties received each quarter to Morgan. Defendants thus has engaged in a series of at least 80 transactions that affected interstate commerce either (1) involving the movement of funds by wire (the bank wire transfers) or (2) involving one or more monetary instruments, or (3) involving a transaction involving the use of a financial institution which is engaged in, or the activities of which affect interstate commerce, all in violation of section 1956. Defendants did so knowing that the funds involved in these financial transactions (the wire transfers from ARS to Morgan) represented the proceeds of some form an unlawful activity (the above described mail and wire frauds), and Defendants conducted a financial transaction which in fact involved the proceeds of a violation of 18 U.S.C. §§ 1341 or 1343, as alleged above, both of which are specified unlawful activities under section §1956. Defendants did so with the intent to promote the carrying on of these specified unlawful activities; all of which constitute money laundering in violation of 18 U.S.C. § 1956(a);

This is surely adequately pleaded.

The racketeering "enterprise" through which these defendants acted alleged in the AC is specifically identified as being ARS (AC ¶¶ 79, 80), and the participation of each Defendant in the enterprise's activities are detailed at AC ¶¶ 80 through 84. These allegations qualify: Enterprises under RICO include "any union or group of individuals associated in fact although not a legal entity." *See United States v. Turkette*, 452 U.S. 576, 578 n.2, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) Such so-called association-in-fact enterprises may be "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *See Turkette*, 452 U.S. at 583, 101 S.Ct. 2524. The group need not have some decision-making framework or mechanism for controlling the members. And the concept

includes "any union or group of individuals associated in fact although not a legal

entity." *See Turkette,* 452 U.S. at 578 n. 2, 101 S.Ct. 2524, 69 L.Ed.2d 246. Such so-called

association-in-fact enterprises may be "proved by evidence of an ongoing organization, formal or

informal, and by evidence that the various associates function as a continuing unit." *See Turkette,*

452 U.S. at 583, 101 S.Ct. 2524. The group need not have some decision-making framework or

mechanism for controlling the members:

> . . . because RICO's plain terms "encompass '*any* ... group of individuals
> associated in fact,' ... the definition has a wide reach," meaning "the very concept
> of an association in fact is expansive."

*Boyle v United States*, 556 U.S. 938, 944, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009) (emphasis

added by the *Boyle* Court).

### D.  McKenzie Has Adequately Alleged Injury

To begin with, "[U]nder RICO, a person can be injured 'by reason of' a pattern of mail

[or wire] fraud even if he has not himself relied on any misrepresentations." *Empire Merchants,*

*LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 140–41 (2d Cir. 2018). AC ¶ 87 alleges that:

> The widespread sale of these fraudulent licenses unfairly raised the market value
> of LOVE artwork and its presence in the marketplace, while at the same time
> diminished the value and thus the marketability of the Indiana works produced
> fairly by Michael McKenzie/American Image, including the HOPE image that
> was marketed honestly. In fact, ARS rejected McKenzie and the HOPE work he
> produced for licensing, stating to McKenzie that it would be a conflict of interest
> with Morgan and that Morgan had instructed that ARS could not do so.

McKenzie alleges that he and ARS were and are competing in the same narrow market

channels for the same type of consumers and licensees (AC ¶¶ 45, 48-55, 60-61). As a result of

the Defendants false statements disseminated to consumers and licensees on their commercial

website, McKenzie alleges that he has experienced a lessening of sales. (AC ¶¶ 48, 56,60-61).

He also alleges that ARS would not deal with his HOPE image citing a conflict of interest with

Morgan's LOVE image, showing indeed that the two images are directly competitive. (AC ¶ 87)

These allegations are not defeated by Defendants' cite to *Anza v. Ideal Steel Supply*

*Corp.*, 547 U.S. 451 (2006), a case where a plaintiff steel company brought a RICO case against

a defendant steel company alleging that the latter cheated on his state oil taxes and thus by that

fraud damaged the Plaintiff steel company by having a lower cost of production and thus a

competitive edge. That is certainly speculative as the Second Circuit noted that many reasons

could have caused the cheating steel company to get more sales. In a case much closer to

McKenzie's, the Second Circuit reversed the lower court applying *Anza* to its facts:

> AlixPartners LLP and McKinsey & Co., Inc. are major competitors in a niche
> bankruptcy advising market involving estates with assets in excess of one billion
> dollars. Jay Alix, as assignee of AlixPartners, sued McKinsey & Co., Inc. …,
> [alleging] that McKinsey secured lucrative consulting assignments in this market
> by knowingly and repeatedly filing disclosure statements in the Bankruptcy Court
> containing misleading, or false representations concerning conflicts of interest.
> Alix alleges that this pattern of misrepresentations to the Bankruptcy Court
> resulted in injury to AlixPartners through the loss of engagements it otherwise
> would have secured . . . .
>
> . . .  Alix alleges that AlixPartners was directly harmed by McKinsey's conduct
> because, had McKinsey truthfully and timely disclosed its conflicts to the
> Bankruptcy Court, McKinsey would have been disqualified from obtaining at
> least some of the assignments it secured. In turn, Alix alleges that AlixPartners,
> because of its major presence in this niche market, would have been retained in at
> least some of the cases.
>
> The District Court . . . dismissed Alix's RICO claims under Federal Rule of Civil
> Procedure 12(b)(6). The court concluded that Alix's allegations were insufficient
> to establish the required causal connection between McKinsey's purported RICO
> violations and AlixPartners's injury. This appeal followed. The dispositive issue is
> whether the amended complaint adequately alleges proximate causation under
> RICO. We hold that it does and, consequently, we vacate and remand for further
> proceedings.

*Alix v. McKinsey & Co.*, 23 F.4th 196, 199–200 (2d Cir.), *cert. denied,* 214 L. Ed. 2d 132, 143 S.

Ct. 302 (2022), In *Alix,* the Court distinguished *Anza* by pointing out that there were a discrete

group of persons who could have been appointed to these rarified positions and, had the playing field been level meaning had Defendant McKinsey been honest about its disqualifying background, it was plausible that some of the business would have gone to Alix. It also noted that the district court had confused the liberally construed proximate cause with proof of damages. *See Alix.*, 23 F.4th at 207 ("we note that uncertainty on how to calculate damages should not be confused with proximate cause because they are distinct concepts")

Our case is much more akin to *Alix* given the head-to-head competition between the two most popular Indiana images, only one of which was and is adorned with a false assertion of authenticity. This Court should leave to trial the question of whether HOPE sales were lost by the false copyright assertion made to licensees of all manner of goods that caused these licensees to flock to the cachet of the LOVE copyrighted image rather that to consider and purchase instead the uncopyrighted HOPE image. Clearly ARS thought they were direct competitors because it informed McKenzie that offering the HOPE image to licensees was a conflict of interest. It is certainly more reliable to consider what ARS told McKenzie before this litigation rather than now, when it seeks to take refuge in a proximate cause argument saying the two images were not at all comperable.

**CONCLUSION**

Defendants' motion should be denied.

Date: February 6, 2023                          Respectfully submitted,

                                                /s/ *John J. E. Markham, II*
                                                John J. E. Markham, II (JM4744)
                                                MARKHAM READ ZERNER LLC
                                                11A Commercial Wharf West
                                                Boston, Massachusetts 02110
                                                Tel: (617) 523-6329

Fax: (617)742-8604
*jmarkham@markhamreadzerner.com*

<u>Certificate of Service</u>

I, John J.E. Markham, II hereby certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified and paper copies will be sent to any indicated as non-registered participants on February 6, 2023.

/s/ *John J. E. Markham, II*
John J. E. Markham, II